LIGHTNING LUBE, INC.; Laser Lube, a New Jersey Corporation

v.

WITCO CORPORATION; Avis Service, Inc.; Avis Lube, Inc.; Avis Enterprises, Inc., Defendants/Third Party Plaintiffs,

v.

Ralph VENUTO, individually and d/b/a Laser Lube, Lightning Lube, and Automotive Management Systems; Carol Venuto, his wife, individually; Automotive Management Systems, Inc., a New Jersey Corporation, Third Party Defendants,

Witco Corporation, Appellant.

LIGHTNING LUBE, INC.; Laser Lube, a New Jersey Corporation

v.

WITCO CORPORATION; Avis Service, Inc.; Avis Lube, Inc.; Avis Enterprises, Inc., Defendants/Third Party Plaintiffs,

v.

Ralph VENUTO, individually and d/b/a Laser Lube, Lightning Lube, and Automotive Management Systems; Carol Venuto, his wife, individually; Automotive Management Systems, Inc., a New Jersey Corporation, Third Party Defendants,

Lightning Lube, Inc., t/a Laser Lube, Appellant.

Nos. 92–5476, 92–5543.

United States Court of Appeals, Third Circuit.

Argued July 20, 1993.

Decided Sept. 10, 1993.

**1160**

Ronald S. Rolfe (argued), Lewis J. Liman, Cravath, Swaine & Moore, New York City, Brendan T. Byrne, John G. Gilfillan, III, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, NJ, for appellant-cross-appellee Witco Corp.

Laurence H. Tribe (argued), Jonathan S. Massey (argued), Cambridge, MA, Steven M. Kramer, Jeffrey S. Nowak, New York City, for appellee-cross-appellant Lightning Lube, Inc.

BEFORE: MANSMANN, GREENBERG, and LEWIS, Circuit Judges.

### OPINION OF THE COURT

GREENBERG, Circuit Judge.

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | BACKGROUND | 1162 |
| | A. FACTUAL HISTORY | 1162 |
| | B. PROCEDURAL HISTORY | 1165 |
| II. | STANDARD OF REVIEW | 1166 |
| III. | WITCO'S APPEAL | 1167 |
| | A. TORTIOUS INTERFERENCE | 1167 |
| | B. BREACH OF CONTRACT | 1172 |
| | C. COMPENSATORY DAMAGES | 1174 |
| | 1. Fed.R.Evid. 701 | 1175 |
| | 2. Damages not Proven with Reasonable Certainty | 1176 |
| | D. MISCONDUCT BY LIGHTNING LUBE'S COUNSEL | 1178 |
| | 1. Mistrial | 1178 |
| | 2. Refusal to Allow Kramer to Testify | 1180 |
| | 3. Limiting the Witnesses' Testimony | 1180 |
| | 4. General Prejudice Claim | 1181 |
| IV. | LIGHTNING LUBE'S CROSS–APPEAL | 1182 |
| | A. FRAUD | 1182 |
| | 1. Nondisclosure of Intent to Compete | 1183 |
| | 2. Misrepresentation of Intent to Fulfill the Contract | 1186 |

| | PAGE |
|-------------------------------------------|------|
| B. RICO | 1187 |
| 1. Section 1962(a) | 1187 |
| 2. Section 1962(b) | 1189 |
| 3. Section 1962(c) | 1191 |
| 4. Section 1962(d) | 1191 |
| C. PUNITIVE DAMAGES | 1192 |
| 1. Ratification or Authorization | 1193 |
| 2. Payback Schedule | 1194 |
| 3. Cover–Up | 1194 |
| 4. Witco–Avis Venture | 1194 |
| 5. Credit Hold | 1195 |
| 6. Source of Oil Fraud | 1195 |
| 7. Glady's Activities | 1196 |
| 8. Counterclaim | 1196 |
| V. CONCLUSION | 1200 |

These appeals arise from a civil action brought in the United States District Court for the District of New Jersey, in which a quick-lube franchisor, Lightning Lube, Inc. t/a Laser Lube (Lightning Lube), obtained a jury verdict for approximately $11.5 million in compensatory damages and $50 million in punitive damages against its motor oil supplier, Witco Corporation (Witco). Lightning Lube accused Witco of breaching its supply agreement and destroying Lightning Lube's relationship with its franchisees to benefit a competing quick-lube business that Witco had started with Avis Services, Inc. (Avis). Witco's actions allegedly caused Lightning Lube's existing franchisees either to abandon it or to hold back payment of royalty fees and resulted in large numbers of prospective franchisees never opening Lightning Lube centers. As a result, Lightning Lube lacked the cash flow necessary to continue operating and its owner, Ralph Venuto, was forced to sell its assets to another company for far less than their true worth.

Lightning Lube asserted six claims against Witco, but at the end of the trial, only four remained in the case: (1) breach of contract; (2) fraud and misrepresentation; (3) intentional interference with contracts and prospective contractual advantage; and (4) punitive damages. At the conclusion of a three-month trial, the jury returned a verdict of liability on all four counts, though not on every claim within each count. The jury, however, found in favor of Witco on counterclaims to recover payment for unpaid charges for equipment and oil. Thereafter Witco moved for judgment as a matter of law or, in the alternative, for a new trial. The district court granted the motion in part and denied it in part in a comprehensive opinion dated September 2, 1992. *See Lightning Lube, Inc. v. Witco Corp.,* 802 F.Supp. 1180 (D.N.J.1992). In its opinion, the district court granted judgment and, alternatively, a new trial, on two of the fraud claims on which separate verdicts for $1.0 million each had been returned and on the punitive damages claims, but denied Witco judgment or a new trial on Lightning Lube's third fraud claim, on which no damages had been awarded, and on Lightning Lube's claims of tortious interference with economic relations and breach of contract. The court, therefore, left intact approximately $9.5 million of the approximately $61.5 million that the jury originally had awarded to Lightning Lube.

Witco now appeals from the district court's order of September 2, 1992, to the extent it denied Witco's motion as to the tortious interference and breach of contract claims. Lightning Lube cross-appeals from the district court's grant of judgment and a conditional new trial to Witco on Lightning Lube's fraud and punitive damages claims. It also appeals from the district court's pretrial order of February 19, 1991, granting summary judgment to Witco on Lightning Lube's RICO claims.[1] For the reasons discussed

---

**1.** The notices of appeal are stated more broadly but we confine our description of them to the

below we will affirm the district court's orders in their entirety.

We have jurisdiction pursuant to 28 U.S.C. § 1291. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (the RICO claims) and 1332 (all other claims). The parties are in agreement that New Jersey law governs the state law claims.

## I. BACKGROUND

### A. FACTUAL HISTORY

To the extent that the facts at trial were in dispute we state them in the light most favorable to the verdict winner, i.e, Lightning Lube on the complaint and Witco on its counterclaim for nonpayment for equipment and oil. From late 1985 until 1989, Lightning Lube was a quick-lube franchisor. Consumers go to a quick-lube center to have oil changes and related services performed on their vehicles in approximately ten minutes. As part of its franchise agreements, Lightning Lube agreed to provide oil, equipment, site-selection assistance, training, and marketing assistance to its franchisees in exchange for royalty and advertising fees. Lightning Lube grew out of the business of third-party defendant Automotive Management Systems, Inc., a franchisor of transmission and brake and muffler facilities run by the third-party defendant Ralph Venuto. Venuto and another person founded Lightning Lube in 1985, but in June 1986, Venuto bought out his partner's interest, and became the sole owner of the company.

From June 1986 to August 1987, Witco,[2] through a division called Kendall Refining Company,[3] sold motor oil to Lightning Lube and provided Lightning Lube franchisees with oil dispensing equipment. The Kendall division refines petroleum from its own wells and from other sources for use as automotive motor oil. Witco instituted a program for quick-lube national accounts and independent quick-lube operators, whose participants could purchase Kendall oil at a discount. Under this program, Witco would supply a quick-lube operator with lubrication dispensing equipment on loan, free of charge, on the condition that the operator sold Kendall oil through the equipment in a specified minimum quantity. Witco could repossess the equipment if the operator did not adhere to the minimum-use requirement.

In April and May 1986, Ralph Venuto met with representatives of Witco to discuss the possibility of Lightning Lube becoming a Witco quick-lube national account. At these meetings Venuto inquired whether Witco, in a departure from the industry norm, would consider loaning Lightning Lube money to purchase the lube equipment instead of loaning Lightning Lube the equipment itself. Venuto desired to buy his own equipment because he did not want to be obligated to use Kendall oil at a fixed price and quantity. At the time of his discussions with Witco, Venuto also was negotiating with another oil refiner, Valvoline Oil Co. (Valvoline). According to Venuto, Valvoline ultimately offered to lend him $15,000 per center, to be repaid at 10% interest within 5 years, so that

matters actually in issue. Lightning Lube's First Amended Complaint contained claims of unfair competition and price and service discrimination under the Robinson–Patman Act. The district court granted Witco a judgment as a matter of law with respect to these claims on April 3, 1992, and Lightning Lube does not appeal from this order. Likewise, Lightning Lube does not challenge the district court's pretrial dismissal of its claims against Avis, Inc.

2. Prior to June 1986 Witco had sold motor oil and equipment to Lightning Lube franchisees on an ad-hoc basis. However, after June of that year the sales were pursuant to the agreement involved in this case.

3. Kendall is a Pennsylvania corporation with its principal place of business in Bradford, Pennsyl-

vania. Witco is a Delaware corporation, with its principal place of business in New York, New York. Lightning Lube and Automotive Management Systems are New Jersey corporations, with their principal places of business in that state. Ralph Venuto is a citizen of New Jersey. Curiously, in the caption to its amended complaint, Lightning Lube lists Witco and Avis, but not Kendall, as defendants, but in its jurisdictional statement, the complaint discusses the citizenship of Kendall, yet omits any discussion of Witco's citizenship. At oral argument, however, the parties agreed that Witco, not Kendall, is the defendant in this action. Accordingly, for convenience sake we will refer to Kendall and Witco collectively as Witco.

he could buy equipment and supply oil to his franchisees.

Eventually, however, when Witco agreed to Venuto's proposal that it loan him the money to buy equipment, Venuto decided to go with Witco rather than Valvoline. As Venuto explained at trial, Witco promised him real estate financing as well as a better interest rate on the money it lent him for the equipment and what he regarded as a better quality of oil—100% Pennsylvania crude oil—than Valvoline offered.

On May 9, 1986, Venuto and Witco reached an agreement providing for Witco to lend Venuto money to purchase his own equipment, which he agreed to repay within five years, at six percent interest. Witco would retain ownership of the equipment during the payout period. Lightning Lube would be billed directly for the oil and then in turn would bill its franchisees for the product they purchased. Witco promised that it would charge Lightning Lube the lowest available price for the oil, which would be 100% Pennsylvania crude oil. Finally, Witco agreed to share the cost of signs promoting both Kendall oil and Lightning Lube. The benefit for Venuto under this agreement was that once Lightning Lube paid for the equipment it would not be obligated to purchase any particular amount of Kendall oil, and thus could purchase product from other suppliers.

Under its agreements with its franchisees, after it received the equipment from Witco, Lightning Lube rented the equipment to its franchisees at $35 per week for five years on the condition that the franchisees sell only oil products purchased from Lightning Lube. The agreements provided that Lightning Lube would retain ownership of the equipment. In addition, Lightning Lube was to receive 7% of the gross sales of each Lightning Lube franchise as a royalty fee and 4% of its gross sales as an advertising fee.

In June 1986, Witco began supplying Lightning Lube's franchisees with oil and equipment. The franchisees placed orders for motor oil with Lightning Lube which Witco distributors delivered directly to the franchisees. Soon after it commenced, however, the relationship between Witco and Lightning Lube began to dry up. In the first place, although Venuto made a request for a payback schedule for the equipment, Witco failed to provide a complete schedule for more than a year. Venuto complained that without such a schedule he could not pay for the equipment or prove to the franchisees that Lightning Lube had purchased the equipment, rather than rented it.

Disputes also arose between the two companies over the payments for oil and equipment. At various times during 1986 and 1987, Lightning Lube fell more than 90 days behind in its oil payments. As a result, in November 1986, Witco placed Lightning Lube on a one-month product hold, during which Lightning Lube could not buy motor oil from Witco, though Lightning Lube's franchisees could purchase oil directly from Witco at the same national account price Witco charged Lightning Lube. Lightning Lube's repeated failures to pay for its oil on time resulted in further product holds in 1987. Furthermore, in January 1987, when Lightning Lube became delinquent in its equipment payments, Witco advised Venuto that Lightning Lube would have to pay in advance for equipment installed at new locations.

During the period of the Witco–Lightning Lube relationship, numerous franchisees that had opened quick-lube shops either terminated their relationships with Lightning Lube or held back royalty payments, and others that had purchased Lightning Lube franchises decided not to open at all. From 1985 to 1987, Lightning Lube sold over 170 franchises. Yet, in total only between 30–40 franchisees actually opened. Ultimately, the failure of these franchisees either to open or to continue with Lightning Lube led to a cash shortage that crippled Lightning Lube's business. The reason that these franchisees and prospective franchisees ended their relationship with Lightning Lube was the critical issue at trial.

According to evidence presented by Witco, the franchisees terminated their relationship with Lightning Lube because Lightning Lube failed to honor its advertising obligations, did not assist in locating sites, and did not provide promised financial assistance.

Some of these franchisees filed suits against Lightning Lube charging it with fraud, violations of the New Jersey Consumer Fraud Act, breach of contract, and other misdeeds.

Lightning Lube, however, presented evidence that Witco was responsible for the dissatisfaction and defection of the franchisees. Lightning Lube attributed its difficulties in servicing its franchisees to a cash shortage caused by franchisees terminating their agreements and demanding refunds or by their underpaying royalty fees. In Lightning Lube's view, Witco, by failing to provide a complete equipment payback schedule for more than a year, caused the franchisees to doubt whether Lightning Lube owned the equipment. Witco salespersons fanned these doubts by informing the franchisees that Witco, and not Lightning Lube, owned the equipment and that Witco would confiscate the equipment unless the franchisees agreed to defect from Lightning Lube. Rumors that Lightning Lube did not own the equipment and that its franchisees could lose their equipment were repeated at franchisee meetings in September and December 1986, and they led to several defections immediately after these meetings. Lightning Lube further claimed that Witco salespersons also destroyed franchisee confidence in Venuto by offering them free equipment and cheaper oil than Lightning Lube sold and by telling them that Venuto was "ripping them off."

Given his problems with Witco, as early as February 1987, Venuto began negotiating with Valvoline to lend him money for his payments to Witco and to replace Witco as Lightning Lube's supplier. Lightning Lube and Valvoline did not reach an agreement, and sometime in the middle of 1987, Venuto began negotiating with P & M Oil, an Exxon distributor. In August 1987, Venuto terminated his relationship with Witco and began using Exxon oil. As a consequence, the remaining Lightning Lube franchisees began selling Exxon's product. Nevertheless, Witco did not remove its equipment from the Lightning Lube franchises.

According to Lightning Lube, the arrangement for Exxon oil came too late to cure the damage committed by Witco. As a consequence of Witco's actions, Lightning Lube lacked the capital to service those franchises still under contract, which in turn led to more franchisee dissatisfaction. Finally, what Lightning Lube regarded as its "death blow" came in October 1987 when, in response to Lightning Lube's filing this suit against it, Witco filed several counterclaims, one of which alleged that Lightning Lube had defrauded both Witco and its own franchisees by selling Kendall oil at a price in contravention of its agreement with Witco. Lightning Lube claims that Witco knew this claim had no factual basis. Nonetheless, Lightning Lube believed that it was required to disclose the allegation of fraud to prospective franchisees, a revelation which made it impossible for Lightning Lube to sell any more franchises. By July 1988, Lightning Lube's sales manager resigned due to the futility of trying to attract new franchisees. In the fall of 1989, Venuto sold Lightning Lube's remaining assets to Shamrock Energy Corporation for a price allegedly far below their true value.

According to Lightning Lube, Witco had two motives for trying to destroy Lightning Lube: first, Witco wanted to bypass Venuto to ensure that the franchisees purchased only Kendall oil; second, Witco wanted to benefit a new venture that it had started with one of Lightning Lube's competitors. In December 1986, Avis and Witco announced that they had reached an agreement providing that Witco, through a new subsidiary, Witco Realty Company, would form a partnership with a subsidiary of Avis, Avis Lube, Inc., a quick-lube competitor of Lightning Lube. The partnership, K & A Lube Properties, would finance the purchase of real estate and building construction for Avis Lube sites. The sites then would be leased to Avis Lube franchisees. Those Avis Lube centers which accepted Witco financing would be obligated to use Kendall oil and assorted products for 90% of their needs. In essence, then, Witco would be financing quick-lube centers which would compete with Lightning Lube. Throughout the trial, Witco maintained that negotiations between Witco and Avis did not begin until August 1986, and that the agreement was reached only in December of that year. Lightning Lube, however, contended

that Witco and Avis had reached an informal agreement as early as April 1986, before Witco and Lightning Lube reached their agreement.

The timing of the Avis–Witco agreement was a key to Lightning Lube's case, because if the agreement had been reached prior to the Witco–Lightning Lube agreement, it could explain Witco's conduct toward Lightning Lube. Lightning Lube believed that Witco knew all along that it would form a partnership in the quick-lube business with Avis. Yet, it was very expensive to start a quick-lube franchise chain from the ground up. Accordingly, Lightning Lube believed Witco and Avis conspired to steal Lightning Lube's franchisees to save on the start-up costs. Thus, Lightning Lube contended that Witco in furtherance of this goal entered into its agreement with Lightning Lube in May 1986 in order to discover Lightning Lube's trade secrets and to gain access to its franchisees, whom it eventually could strip away.

## B. PROCEDURAL HISTORY

On August 10, 1987, Lightning Lube filed this suit against Witco and Avis in the United States District Court for the District of New Jersey, asserting that they had engaged in a corporate campaign and conspiracy to destroy Lightning Lube. The complaint, as amended on May 8, 1989, alleged that Witco: (1) breached its agreement to provide Lightning Lube with motor oil, equipment, reimbursement for joint signs, and a payback schedule for the money Witco loaned Lightning Lube to purchase its equipment; (2) committed fraud by misrepresenting its intent to fulfill its contract with Lightning Lube, misrepresenting the source and quality of the oil it supplied, and failing to disclose that it intended to compete against Lightning Lube through a partnership with Avis; (3) intentionally interfered with Lightning Lube's relations with its franchisees and prospective franchisees; (4) unfairly competed against Lightning Lube through its partner-

ship with Avis; (5) conspired with Avis to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a)–(d); and (6) committed price discrimination in violation of the Robinson–Patman Amendment to the Clayton Act, 15 U.S.C. § 13. In addition to the RICO allegations, the complaint included Avis as a defendant to all the other causes of action on the basis of its status as Witco's "partner, principal and joint venturer." The complaint sought compensatory, punitive, and treble damages as well as interest, costs, attorney's fees, and injunctive relief.

Witco filed an answer which denied liability and asserted counterclaims and third-party claims against Lightning Lube, Ralph and Carol Venuto, and Automotive Management Services, Inc. for the nonpayment for oil and equipment delivered to Lightning Lube.[4] Significantly, the counterclaims also included a charge that Lightning Lube had defrauded its franchisees by overcharging them for oil it purchased from Witco. Avis also filed an answer.

By an opinion and order dated November 27, 1990, the district court granted summary judgment to Avis on all the non-RICO claims. On February 19, 1991, the court granted Witco's and Avis's motion for summary judgment on the RICO claims and dismissed Avis from the case. The remaining claims against Witco were tried before a jury between February 3, 1992, and May 1, 1992. At the close of Lightning Lube's case, Witco moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The district court granted Witco's motion only with respect to the unfair competition and Robinson–Patman discrimination claims. At the close of all the evidence, Witco renewed its motion for judgment, and the district court reserved decision.

On May 4, 1992, the jury returned a verdict for Lightning Lube on almost all of its remaining claims. Specifically, in response to comprehensive interrogatories, the jury

4. Witco also asserted counterclaims and third-party claims alleging, *inter alia,* that Lightning Lube and Venuto tortiously interfered with Witco's relations with Lightning Lube's franchisees and prospective franchisees; infringed Witco's

trademark in Kendall oil, by allowing Lightning Lube franchisees to dispense non-Kendall oils from equipment containing Kendall trademarks; and defrauded Witco.

awarded Lightning Lube $2.5 million for breach of contract based on Witco's failure to provide an equipment payback schedule; $18,340 for breach of contract based on Witco's failure to provide advertising and sign allowances; $1 million for fraud based on Witco's failure to disclose its intention to enter the quick-lube market as a competitor of Lightning Lube; $1 million for fraud based on Witco's intention not to honor the agreement at the time it was entered; and $7,045,500 for tortious interference with Lightning Lube's relations with its franchisees and prospective franchisees. The jury also determined that Witco had committed fraud by misrepresenting that it would supply Lightning Lube with 100% Pennsylvania crude oil, but found that Lightning Lube sustained no injury from this misrepresentation. The jury further found that Witco did not breach its contractual obligation to sell motor oil to Lightning Lube at the lowest available price. The jury also awarded Lightning Lube punitive damages of $50 million on the fraud and tortious interference claims without a breakdown between them. However, the jury found for Witco on its counterclaim that Lightning Lube was indebted to it for payments due for equipment and oil.[5]

Witco filed a posttrial motion for judgment as a matter of law or, in the alternative, for a new trial. On September 2, 1992, the district court granted Witco's renewed motion for judgment as a matter of law on the two fraud claims, for which the jury had awarded damages, and the punitive damages claim. *See Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. at 1203. In the alternative, the district court conditionally granted Witco a new trial on these fraud and punitive damage claims so that if its judgment as a matter of law were reversed there would be a new trial on those claims. *Id.* The district court, however, denied Witco's motion for judgment or a new trial on the tortious interference and breach of contract claims and also denied Witco's motion on Lightning Lube's claim of misrepresentation of the source and quality of the oil. *Id.* Witco appeals from the partial denial of its motion except as to the

portion dealing with the source and quality of the oil. Lightning Lube cross-appeals, requesting that we reinstate the jury verdict on the fraud and punitive damage claims and reinstate the RICO claims on which the district court granted Witco summary judgment. Lightning Lube does not appeal from the district court's orders dismissing Avis from the case.

## II. STANDARD OF REVIEW

■■■ We exercise plenary review of an order granting or denying a motion for judgment as a matter of law and apply the same standard as the district court. *Wittekamp v. Gulf & Western Inc.*, 991 F.2d 1137, 1141 (3d Cir.1993). Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. *Id.* In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability. *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir.1993). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978) (citation omitted) (quotation omitted). Thus, although the court draws all reasonable and logical inferences in the nonmovant's favor, we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence.

---

**5.** The court entered judgment on the verdict in favor of Witco for $442,655.50 for equipment

and $57,542.21 for motor oil. Lightning Lube does not appeal from this judgment.

■ We review the district court's order ruling on a motion for a new trial for abuse of discretion unless the court's denial is based on the application of a legal precept, in which case the standard of review is plenary. *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir.1992). Finally, we exercise plenary review of the order granting summary judgment to Witco on Lightning Lube's RICO claims. *Coar v. Kazimir*, 990 F.2d 1413, 1416 (3d Cir.1993), *petition for cert. filed*, 62 U.S.L.W. 3060 (U.S. July 9, 1993) (No. 93–62).

### III. WITCO'S APPEAL

### A. TORTIOUS INTERFERENCE

■ We begin with Witco's argument that Lightning Lube failed to establish sufficiently its tortious interference claim. Under New Jersey law the five elements of a claim of tortious interference with a prospective or existing economic relationship are: (1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference. *Fineman*, 980 F.2d at 186; *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 563 A.2d 31, 37 (N.J. 1989). In formulating this definition of the cause of action, New Jersey courts have relied on the *Restatement (Second) Torts* §§ 766A and 766B. *See, e.g., Printing Mart–Morristown*, 563 A.2d at 37; *Norwood Easthill Assocs. v. Norwood Easthill Watch*, 222 N.J.Super. 378, 536 A.2d 1317, 1319 (App.Div.1988).

■ "An action for tortious interference with a prospective business relation protects the right 'to pursue one's business, calling, or occupation free from undue influence or molestation.'" *Printing Mart–Morristown*, 563 A.2d at 36 (quoting *Louis Kamm, Inc. v. Flink*, 175 A. 62, 66 (N.J.1934)). Although businesses have the right to compete fairly with one another, that right does not extend to actions taken with the malicious purpose of harming a competitor's business. Thus, "[w]hat is actionable is '[t]he luring away, by devious, improper and unrighteous means, of the customer of another.'" *Id.* (quoting *Louis Kamm, Inc.*, 175 A.2d at 66); *see also Association Group Life, Inc. v. Catholic War Veterans*, 120 N.J.Super. 85, 293 A.2d 408, 415 (App.Div.1971) (in determining whether interference is actionable, jury must find defendant's conduct "both injurious and transgressive of generally accepted standards of common morality or law"), *modified*, 61 N.J. 150, 293 A.2d 382 (1972); Perlman, *Interference with Contractual and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 78 n. 88 (1982) (citing New Jersey as an example of a jurisdiction "extend[ing] liability to cases where the defendant's actions are not independently unlawful" but are rendered "tortious solely because the intent, the result, or both were to disrupt a particular contractual relationship").

■ Lightning Lube predicated its tortious interference claim on allegations that Witco salespersons induced its franchisees to defect by: threatening to remove equipment; offering free equipment with the knowledge that Lightning Lube had contracts with the franchisees to supply equipment; defaming Venuto; offering to sell oil directly to the franchisees without telling Venuto; and intentionally delaying the delivery of a complete equipment payback schedule to Lightning Lube so as to raise doubts in the franchisees' minds as to whether Lightning Lube owned the equipment. Lightning Lube further alleged that Witco drove away prospective franchisees by asserting a counterclaim that accused Lightning Lube of fraud when Witco knew that there was no basis for such a claim.[6]

---

**6.** Inasmuch as we find that Lightning Lube introduced sufficient evidence of Witco's tortious interference through the activities of its salespersons, we do not address in this section of the opinion whether Lightning Lube sufficiently established its allegation of tortious interference in regard to the counterclaim. However, we do explain in part IV.C.8, *infra*, why Lightning Lube has not proven its case with respect to the counterclaim.

Though it essentially concedes that the acts attributed to the salespersons, if they occurred, were improper, Witco denies that Lightning Lube demonstrated an injury by reason of these acts. New Jersey law requires that a plaintiff alleging tortious interference with existing or prospective advantage present proof that *but for* the acts of the defendant, the plaintiff "would have received the anticipated economic benefits." *Printing Mart–Morristown,* 563 A.2d at 37. *See also Fineman,* 980 F.2d at 186.[7] Witco argues that the evidence does not satisfy this standard, inasmuch as none of the witnesses testified that the franchisee relationship with Lightning Lube was severed because of anything Witco had done. But Witco concedes that there was testimony describing franchisee meetings held in September and December 1986, at which some Lightning Lube franchisees stated that Lightning Lube did not own the equipment, and that after these meetings approximately 14 franchisees terminated relations with Lightning Lube. However, Witco maintains that Lightning Lube failed to link these defections with any statements attributed to Witco salespersons. We disagree, as Lightning Lube did adduce sufficient evidence to permit a reasonable jury to conclude that these defections and others as well resulted from Witco's tortious statements.

In support of its claim of tortious interference, Lightning Lube offered the testimony of three Lightning Lube franchisees, Barry Vangarelli, Joseph Craig, and Alan Fischer, who recounted being threatened with the loss of their equipment if they did not leave Lightning Lube. Vangarelli testified that William Corwin, Witco's district sales manager, visited his shop in June 1987, and told him that if he were to use any other oil than Kendall, he ran the risk of having his equipment repossessed. "He said if you run in other kind of motor oil through your reel equipment, he said don't be surprised that if somebody won't walk in your door from [Wit-

co] and dismantle it from your ceiling." Vangarelli also testified that Corwin told him that he was "being ripped off" by Venuto. Corwin promised him free equipment, stating that "if you walk away from Ralph and deal directly with me and [Witco], we'll come in, we'll put new reel equipment in for you and there won't be anymore rental charge."

Witco argues that Vangarelli's testimony does not show that Corwin's activities damaged Lightning Lube because Vangarelli remained a Lightning Lube franchisee through the trial. Yet Witco ignores Vangarelli's testimony that as a result of his conversation with Corwin he "lost trust in the Laser Lube concept" and that he discouraged approximately 25 to 35 prospective franchisees from signing up with Venuto. Vangarelli claims to have told them "not to get involved with it [Lightning Lube]. I felt I was being ripped off, the same would happen to them." Although on cross-examination, Vangarelli admitted that he had other problems with Venuto, unrelated to Witco, a jury reasonably could have believed that Witco's conduct influenced Vangarelli to discourage prospective franchisees. Indeed, Vangarelli testified that he began discouraging prospective franchisees only *after* Corwin spoke with him. Vangarelli also testified that soon after his conversation with Corwin, he stopped paying royalty fees to Venuto, at least in part because Corwin's comments affected his view of Venuto. "[Corwin] told me that I was being ripped off by [Venuto] and it sounded logical at the time."

Craig testified that he initially worked for Venuto as Lightning Lube's director of operations, and then considered becoming a franchisee himself. He claimed that a visit by Corwin changed his mind. Corwin offered him a deal if he were to go independent. The deal included the same Kendall oil at a cheaper price, free equipment, and signage and advertising dollars. Craig further testified that Corwin claimed that Witco was going to cut off Venuto. Corwin testified

7. In *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224 (1984), the New Jersey Supreme Court held that the cause of action of intentional fraud does not require a showing of actual damages. But given its language in *Printing Mart,* the New Jersey Supreme Court does not seem to have extended this holding to the cause of action of tortious interference. *See also Norwood Easthill Assocs.,* 536 A.2d at 1320 (post-*Nappe* Appellate Division case holding that requirement of proving damages is still element of malicious interference).

that but for these comments he would have joined Lightning Lube and that he repeated this information to other Lightning Lube franchisees. Craig also testified that after the December franchisee meeting, at which "every one in the room" was concerned that Venuto *did not own the equipment*, eight franchisees terminated their agreements with Lightning Lube.

Fischer testified that Corwin offered cheaper oil to him and that he was threatened with repossession of his equipment. Witco points out that Fischer did not leave Lightning Lube. However, Fischer testified that as a result of Corwin's comments, he underreported the number of cars on which he did lube jobs, thus reducing royalties to Venuto. "[Corwin's comments] had some bearings on my thoughts about the [Lightning Lube] organization." Fischer also testified that he repeated this information to other Lightning Lube franchisees, whom he specifically identified at trial.

Viewing this evidence in the light most favorable to Lightning Lube, we conclude that it has produced at least that minimum quantum of evidence required to show that Witco damaged it. Based on the testimony of these three witnesses, a jury reasonably could have inferred that rumors at the September and December franchisee meetings— that Lightning Lube did not own the equipment—arose from Corwin's threats and misrepresentations. The jury further could have inferred that Corwin's threats and offers of better deals injured Lightning Lube because the franchisees who heard these comments held back royalties and repeated them to other franchisees at the 1986 meetings, which resulted in fewer people opening Lightning Lube centers or paying franchise fees. Indeed, Venuto testified that after the September and December 1986 franchisee meetings, sales contracts for new franchisees decreased. Furthermore, he testified that in 1987 and 1988, following these franchisee meetings, Lightning Lube's cash flow situation became very bad as growing numbers of franchisees withheld royalty payments. "Everybody stopped paying me ... we were just completely cash poor." This reduction of Lightning Lube's cash flow, according to

Venuto, made it "almost impossible" for him to sell new franchises and to serve properly the existing ones. In sum, notwithstanding Witco's assertions to the contrary, the evidence permitted a jury to conclude that Witco's tortious acts damaged Lightning Lube.

■ In seeking to avoid this conclusion, Witco argues that Lightning Lube has failed to establish that it would have signed up the prospective franchisees without Witco's interference. In this regard it points to our opinion in *Fineman*, 980 F.2d at 195, in which we held that a plaintiff's claim of tortious interference with prospective relations, based on the theory that a defendant ruined his future prospects as a consultant by injuring his reputation, failed because he had not demonstrated a reasonable prospect of attaining future business. However, we find proof of whether the prospective franchisees would have signed up with Lightning Lube unnecessary to sustain the jury's verdict in this case. Lightning Lube established that it *already* had sold over a hundred franchises in its first year of existence, but only a fraction of these centers actually opened. This evidence, in conjunction with the testimony that existing franchisees withheld royalty payments, permitted the jury to conclude that Witco injured Lightning Lube by causing the loss of income from these existing franchisees, irrespective of whether the prospective franchisees would have joined Lightning Lube. Thus, unlike the plaintiff in *Fineman*, who predicated his claim solely on the lost potential for future business, Lightning Lube presented the jury with evidence of current business with which Witco interfered.

Witco next argues that whatever the propriety of his acts, Corwin did not have an improper intent because he merely intended to make sure that the franchisees used Kendall oil, which is not inconsistent with their remaining with Lightning Lube. We reject this argument. The above testimony makes clear that Corwin not only tried to ensure that the franchisees used Kendall oil, but also tried to lure them away from Lightning Lube through devious and improper means.

Finally, Witco argues that Lightning Lube failed to prove that Corwin specifically in-

tended to interfere with the franchisees other than the three people with whom he directly spoke. Witco reads New Jersey law to require that a plaintiff alleging tortious interference with multiple agreements establish the defendant's specific intent to interfere with *each* of these agreements. Thus, in Witco's view, in order to recover for the destruction of its business, Lightning Lube was required to demonstrate that Corwin desired that the franchisees who heard his comments repeat them to others. We disagree with this reading of New Jersey's tort law.

■ It is true that a plaintiff seeking to recover for tortious interference must show that the defendant specifically intended to interfere with *that* plaintiff. *See Fineman v. Armstrong World Indus., Inc.*, 774 F.Supp. 225, 250–51 (D.N.J.1991) (finding under New Jersey law that individual plaintiff's claim of tortious interference must be dismissed because he did not show a specific intent to interfere with his contracts; rather he showed only that defendant intended to interfere with plaintiff's company's contracts), *aff'd in part, rev'd in part on other grounds*, 980 F.2d 171 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *Restatement (Second) of Torts* § 766, comment p ("[t]o subject the actor to liability under this rule, his conduct must be intended to affect the contract of a specific person"). From this precept, it is axiomatic that a defendant cannot be liable for interfering with a contract of which he or she was unaware. *See, e.g., Trump Taj Mahal Assocs. v. Construzioni Aeronautiche Giovanni Agusta, S.p.A.*, 761 F.Supp. 1143, 1164 (D.N.J.1991), *aff'd*, 958 F.2d 365 (3d Cir.) (table), *cert. denied*, —— U.S. ——, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992). We also assume *arguendo* [8] that third-party plaintiffs may not recover for tortious interference unless they are parties to the contract that the defendant sought to disrupt. *See Glass Bot-*

*tle Blowers Ass'n v. National Bottle Co.*, 584 F.Supp. 970, 972 (E.D.Pa.1983) (applying Pennsylvania law and *Restatement* in dismissing complaint of third party plaintiffs because they were not parties to the contract interfered with); *Restatement (Second) of Torts* § 766.

■ In those cases which require knowledge of the specific contract and prohibit third parties from recovering for tortious interference, the defendant did not intend to harm the suing parties. Here, however, Witco *did intend* to harm Lightning Lube in regard to its contractual relations; at most it did not intend the *magnitude* of harm which resulted. Witco essentially argues that even if Corwin intended to interfere, he did not intend the extent of consequential damages which resulted, inasmuch as he desired to steal only three of the franchisees who eventually abandoned Lightning Lube. Yet, once it is established that a defendant in a case of tortious interference specifically intended to harm a particular plaintiff, at least with respect to a particular category of contracts, it is appropriate for the trier of fact to consider whether the resulting consequential damage to that plaintiff was a proximate result of the defendant's conduct, not whether the defendant specifically intended to cause the extent of harm suffered. *See, e.g., Norwood Easthill Assocs.*, 536 A.2d at 1319–20 (discussing proximate cause with reference to consequential damages). As the *Restatement* suggests, courts will imply an intent on a defendant's part to harm the plaintiff to whatever extent such harm proximately resulted from defendant's tortious interference:

> [I]f there is no desire at all to accomplish the interference and *it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional.*

**8.** To our knowledge, aside from the district court's holding in *Fineman*, 774 F.Supp. at 250, New Jersey cases have not addressed a claim for tortious interference brought by a plaintiff who was not a party to the contract. In *Fineman*, we did not determine whether New Jersey law would permit such a claim because we found

that the third-party plaintiff failed to establish with reasonable certainty a prospective economic relation. 980 F.2d at 195 n. 17. Likewise, we see no need to determine the issue in this case, inasmuch as Lightning Lube was a party, or would have been a party, to the existing or potential contracts that Witco disrupted.

*Restatement (Second) of Torts* § 767, comment d (emphasis added). For this reason, we do not think that whether a defendant specifically intended to interfere with one contract involving a plaintiff or many is the determinative issue. Rather, once a plaintiff establishes the defendant's knowledge of the contracts at issue and the defendant's intent to harm the plaintiff with respect to *some* of these contracts, the relevant issue as to liability is whether the injury which followed was the proximate result of the alleged interference.[9]

The district court's holding in *Fineman,* does not lead us to reach a different result. In that case, the principal of a company brought an action for tortious interference both on his own behalf as an individual, and on behalf of the company. The district court held that even if the plaintiff had established a viable claim with respect to his company, he had not shown that the defendant intended to interfere with the plaintiff's potential contracts. 774 F.Supp. at 251. But unlike the situation here, in *Fineman* the financial injury alleged as to the plaintiff was different from that alleged as to the company; the defendant purportedly caused the company to lose one type of customer, and the plaintiff another. *Id.* In the present case, however, Corwin is alleged to have done the same type of harm to Lightning Lube no matter which contracts he specifically intended to disrupt. Furthermore, in *Fineman* the individual plaintiff was not a party to the corporate contract that the defendant disrupted and he had not demonstrated any viable potential contracts. Here, Lightning Lube was a party to all the existing contracts with which Corwin interfered, and Lightning Lube has

demonstrated the concrete possibility of attracting additional franchisees.

 Although to our knowledge the New Jersey courts have not had an occasion to consider directly a fact pattern similar to ours, we believe our approach is consistent with New Jersey law. Therefore, we think that if presented with this case, the Supreme Court of New Jersey would hold that if Corwin wrongfully intended to interfere with Lightning Lube's relations with the three existing or potential franchisees to whom he spoke *and* he reasonably could foresee that this interference also would cause Lightning Lube to lose other franchisees, he need not have intended specifically for all of that damage to have occurred in order for Witco to be liable for the entire injury. Evidence of both Corwin's specific intent with respect to the three persons to whom he spoke, two franchisees and one potential franchisee, and of the consequences that directly flowed from his conduct in regard to them suffices to impose full liability upon Witco for the consequences which followed.

In this case, we are satisfied that Lightning Lube's proof meets the standard to support the liability imposed. Corwin clearly intended to interfere with Lightning Lube's business relations with Vangarelli, Craig, and Fischer. Even disregarding Lightning Lube's allegation that Witco's management schemed to destroy Lightning Lube, we believe sufficient proof exists that Corwin, as evidenced by his conduct in connection to these three franchisees or potential franchisees, wished to strip away Lightning Lube's franchisees, through devious and improper

---

**9.** We do not mean to suggest that where the defendant interferes with B's contract with C, which results in C being unable to fulfill a contract with D, and D sues C, but the defendant did not intend to interfere with D's contract, C can recover against the defendant for damages arising from its contract with D. Indeed, Section 767 of the *Restatement* indicates otherwise, and, as we discuss in footnote 8, *supra,* the New Jersey courts have not addressed this issue. But even assuming that New Jersey courts would follow the *Restatement* rule, the rule does not undermine the approach we suggest. Quite the opposite is true. The rule exists not simply because the defendant had no specific intent to harm D, but because the harm done to D is too

remote. *See Restatement (Second) of Torts* § 767. Thus, proximate cause is as determinative as specific intent. In this case, Lightning Lube does not complain that Corwin's direct conduct vis-a-vis the three franchisees prevented it from fulfilling other contracts to third parties; instead, it argues that this conduct disrupted Lightning Lube's economic relations with people in the same category as the three people he approached. Thus, we distinguish our case from the hypothetical discussed above on the ground that Corwin's interference with the other franchise agreements was as direct as his interference with the three franchisees, inasmuch as they all had the same contract with Lightning Lube.

means, if only to ensure that they bought more Kendall oil. Inasmuch as Corwin wished to interfere with three of Lightning Lube's existing or potential franchisees, the jury could have concluded that he intended to interfere with many more for there was nothing unique about the franchise contracts of the three individuals he approached. We also believe that a jury reasonably could infer, given Corwin's regular interaction with Lightning Lube's franchisees and his expertise in the business, that at the time of his tortious conduct, he knew of the existence of the other franchisees and reasonably could foresee that the people he spoke with would repeat his comments, with the result that Lightning Lube would lose more business. We therefore find that both prongs of this test have been satisfied: Corwin intended to harm *this* plaintiff and the harm of which Lightning Lube complains *proximately resulted* from Corwin's conduct. Accordingly, we will affirm the district court's order denying Witco's motion for judgment on this claim.

Concurrent with its motion for judgment as a matter of law on the tortious interference claim, Witco moved, in the alternative, for a new trial, asserting that the jury's verdict on this claim was against the weight of the evidence. The district court denied this motion for the same reasons it denied the motion for judgment. *See Lightning Lube, Inc. v. Witco*, 802 F.Supp. at 1192. We do not believe that the district court abused its discretion in this regard and thus we will affirm the denial of this motion as well.

### B. BREACH OF CONTRACT

■ In its contract claim, Lightning Lube alleged that Witco breached their agreement by: (1) not selling motor oil to Lightning Lube at the lowest available price; (2) delaying in providing a payback schedule, which damaged Lightning Lube because it could not prove to its doubting franchisees that it owned the equipment it rented to

them; and (3) not reimbursing Lightning Lube for joint sign costs. The jury found that Witco did provide Lightning Lube with the lowest price available for motor oil, but that it breached its obligations on the payback schedule and sign fees. The jury therefore awarded Lightning Lube $2.5 million in damages for the delay in providing a payback schedule and $18,340 for the sign costs.

Witco's challenge to the jury's award of $2.5 million in regard to the payback schedule, rather than disputing the liability determination, addresses the sufficiency of the evidence sustaining the damage award.[10] In this regard, it argues that Lightning Lube failed to adduce sufficient evidence that Witco could have contemplated at the time of contracting that its breach of contract in not providing a payback schedule to Lightning Lube on a timely basis would damage Lightning Lube in excess of $2 million by ruining its business.[11] Witco maintains that it was not reasonably foreseeable or contemplated by the parties on May 9, 1986, when Lightning Lube and Witco reached their agreement, that if for some reason Witco did not provide Lightning Lube with a payback schedule for more than a year, the franchisees would know that Lightning Lube did not have a payback schedule; that as a consequence the franchisees would lose faith in Lightning Lube; and that the payback schedule would have provided sufficient proof of Lightning Lube's ownership of the equipment to mollify the franchisees.

■ The district court did not consider the merits of Witco's foreseeability argument because Witco failed to include this point in either its motion for judgment as a matter of law filed at the close of Lightning Lube's case, or in its renewal of the motion at the close of all the evidence. In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion.

---

**10.** Witco does not challenge the jury's verdict on the sign costs.

**11.** Apparently, the $2.5 million figure represents the amount Venuto spent out of pocket and pledged in promissory notes to reimburse the franchisees who terminated relations with him. The jury evidently linked Venuto's past losses to the contract breach, and his future losses, the $7 million, to the tortious interference by Witco.

Fed.R.Civ.P. 50(b). "Absent a motion in accordance with Federal Rule of Civil Procedure 50(a), judicial reexamination of the evidence abridges [a party's] right to a trial by jury." *Fineman,* 980 F.2d at 183. Thus, we will not consider the merits of the foreseeability argument that Witco presses on appeal unless we are satisfied that Witco sufficiently preserved it in the district court.

██ Witco first urges that it *did* raise this issue in its Rule 50(a) motion, when it argued that "[t]here is no evidence that plaintiff sustained any damages as a result of Witco's alleged breach of contract either as to price of oil or as to the equipment." We disagree with this assertion. A motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion *sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient. *Acosta v. Honda Motor Co.,* 717 F.2d 828, 831–32 (3d Cir.1983). Witco's Rule 50(a) motion raised arguments exclusively of proximate causation, and did not put Lightning Lube or the court on notice that Witco was proceeding under the contract law of foreseeability. Thus, Witco's motion would have alerted Lightning Lube as to deficiencies of proof only in so far as Witco contended that its delay in transmitting the payback schedule did not cause the franchisees to defect. However, it did not put Lightning Lube on notice that it might not have adduced insufficient proof that Witco could have foreseen such a result.

██ Witco next argues that it preserved the foreseeability argument by making a motion *in limine* to exclude certain expert testimony. In seeking to exclude the testimony, Witco argued that Lightning Lube's alleged damages for breach of contract were unforeseen and uncontemplated at the time of contract. The district court held:

> I do not find it to be within the scope of a motion *in limine* to make a determination of what was and was not contemplated by the parties during their contract negotiations. I will not rule on the foreseeability of plaintiff's alleged damages. That deter-

mination is best left to the jury to be ascertained at trial.

JA 523. Citing to our holding in *Repola v. Morbark Indus. Inc.,* 934 F.2d 483, 488–89 (3d Cir.1991), Witco argues that an *in limine* argument on which the court has not made a ruling preserves an issue for a Rule 50(b) motion.

In *Repola* the plaintiff, after sustaining a severe injury from a woodchopper machine, brought a products liability suit against the manufacturer and the seller of the machine under common law negligence and New Jersey statutory law. On the first day of trial, counsel for the seller initiated "a somewhat confusing exchange between counsel and the court ... which can only be described as a motion *in limine,* to dismiss the separate negligence cause of action, arguing that the statutory claim" was the sole basis for relief available under New Jersey law. 934 F.2d at 486. The district court reserved decision on the motion and never decided it *in terms.* At the close of the plaintiff's case, the seller moved for a directed verdict but failed to renew its objection to the negligence claim. After a finding of liability and award of separate damages on the common law count, the defendant moved for judgment notwithstanding the verdict, asserting that the statutory claim subsumed the negligence claim and that the jury's findings amount to a rejection of the statutory claim. The district court denied the motion on the ground that the defendant had failed to advance this argument when it moved for a directed verdict. On appeal, we reversed.

In so doing, we recognized that "[i]ndisputably, if an argument is raised in support of a motion *in limine,* the motion is *denied,* and the argument is not restated at the appropriate time, the argument is not preserved under Rules 50 or 51." 934 F.2d at 488 (emphasis in the original). We held "that it is an altogether different matter, however, when an argument is raised in support of a motion *in limine,* but the court *reserves* disposition of the motion and never decides it." *Id.* (emphasis in the original). In such circumstances, "counsel reasonably may conclude that the court has the motion under continu-

ous advisement and that it need not be restated." *Id.*

This holding, however, does not help Witco. In this case Witco could not have thought reasonably that its foreseeability argument was "under continuous advisement" because the court *denied* its *in limine* motion and expressly informed the parties that it would not consider the issue, and instead would leave it to the jury to resolve. This action forewarned Witco that if it thought Lightning Lube had not adduced sufficient evidence of foreseeability, it was incumbent upon it to make a motion for judgment. We also find it significant that unlike *Repola*, this case involved a three-month trial, prior to which *two* district court judges ruled on 69 pretrial motions. It would have been foolhardy for Witco to expect the district court to have kept in mind an issue raised in an *in limine* motion in such a complex and lengthy litigation. Indeed, in *Repola* the so-called *in limine* motion was made during the trial and was not an evidentiary motion at all, but in essence was a motion to dismiss. We therefore find that the district court correctly ruled that Witco waived this argument. Consequently, we will not disturb the order denying Witco's motion for judgment on the breach of contract claim. The district court also denied Witco's motion for a new trial on this issue, 802 F.Supp. at 1193, and we see no reason to disturb that determination either.

### C. COMPENSATORY DAMAGES

Witco next argues that the district court erred in not setting aside the jury's award of compensatory damages. Because we will affirm the order of the district court granting Witco judgment as a matter of law on the fraud claims for the reasons we set forth below, the only damage verdicts that we will discuss are those of $7 million for tortious interference and $2.5 million for breach of contract. Witco advances a two-pronged challenge to these damage verdicts. First, Witco argues that Lightning Lube's principal damages evidence, Venuto's lay opinion testimony, was inadmissible under Fed.R.Evid. 701. Second, Witco argues the testimony was too speculative to sustain the damages awarded.

Prior to trial, Lightning Lube sought to qualify Venuto as an expert on the quick-lube business, but the district court on Witco's motion *in limine* ruled that Venuto could not testify as an expert. The court agreed, however, to allow Venuto to offer lay opinion evidence pursuant to Rule 701 concerning the damages he suffered if a sufficient foundation for the testimony could be laid. At trial Witco objected to the admission of Venuto's lay opinion but the court overruled that objection, reasoning that in view of Venuto's experience in the quick-lube business, he was qualified to predict how well Lightning Lube could have been expected to do.

During his testimony, Venuto presented a claim for $74 million in compensatory damages. He stated that these damages for the most part represented the loss of past royalties and future profits over the ten-year period from 1986 to 1996, as well as refunds he had to give to the franchisees who had terminated their agreements. Venuto limited his future damages to a ten-year period because the franchise contracts he signed were of that duration.

As to past damages, Venuto testified that in his first year he sold 117 franchises at $17,500 each and that because of terminations caused by Witco's activities he had to refund these monies, which came to a total of $2,475,000. Venuto established these damages through his testimony and that of his bookkeeper, which showed that he spent approximately $500,000 out of his own pocket and was indebted for $2 million in promissory notes to reimburse the franchisees.

Venuto calculated future profits in two ways. First, he calculated the profits he would have earned on the 117 franchise contracts that he actually sold. Venuto predicted that after four years in business each center would have been generating $28,000 in royalty fees. Given this calculation, plus the money the franchisees would have earned in the first four years, Venuto predicted that he would have earned $27,729,000 in future profits from the 117 existing contracts through 1996. Next, Venuto calculated the lost profits on the franchises he expected to have sold. Based on projections he developed

with an accounting firm when he was planning to take the company public, Venuto predicted that he would have sold 370 more franchises over the ten-year period, that all of them would have opened (37 a year), and that he would have earned $43,821,000 from these franchises using the formula discussed above.

Venuto further testified that he based his determination of profits on his low operating costs. Although Venuto did not compare his operation to other lube franchises such as Jiffy Lube or Grease Monkeys, he did compare it to the profit and costs projections of Avis Lube contained in a document made by Witco and obtained by Lightning Lube through discovery. Venuto went down the costs line by line, explaining why his operation was cheaper to run than Avis's and thus why he would make the anticipated profits.

It appears that the jury apportioned Venuto's past damages, ($2.5 million) under breach of contract, and his claims of future damages ($7 million) under tortious interference. It is quite clear from the record that there is ample support for the past damages. Thus, we will discuss only whether Lightning Lube has demonstrated its entitlement to an award of $7 million in future lost profits.

### 1. *Fed.R.Evid. 701*

■ Federal Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

As we have recognized previously, "[t]he modern trend favors the admission of [lay] opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *Teen–Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir.1980). Venuto thus was not required to qualify as an expert to offer opinion testimony concerning Lightning Lube's lost profits. *Id.* (accountant's personal knowledge of plaintiff's balance sheets sufficient to qualify

him as a lay witness eligible under Rule 701 to testify as to calculation of lost profits); *Joy Mfg. Co. v. Sola Basic Indus., Inc.*, 697 F.2d 104, 110–12 (3d Cir.1982) (district court abused its discretion in striking nonexpert opinion testimony rationally based on witness's personal knowledge).

■ Witco argues that Lightning Lube failed to satisfy either of Rule 701's prerequisites for establishing a foundation for Venuto's lay opinion testimony. Witco first contends that the testimony was not based on Venuto's perceptions because he relied on the reports of an accountant. However, Venuto testified that he personally participated in making that report, a fact which Witco conceded at trial when it sought to exclude the accountant's damage report on the ground that Venuto and *not* the accountant formulated the projections. Thus, Witco's previous *admissions belie its present argument*. In any event, given Venuto's knowledge and participation in the day-to-day affairs of his business, his partial reliance on the report, even if prepared by an outsider, does not render his testimony beyond the scope of Rule 701. As the district court correctly noted, "[i]t is logical that in preparing a damages report the author may incorporate documents that were prepared by others, while still possessing the requisite personal knowledge or foundation to render his lay opinion admissible under Fed.R.Evid. 701." *Lightning Lube, Inc. v. Witco*, 802 F.Supp. at 1193.

■ Next, Witco argues that Venuto's damages testimony with respect to lost profits was not helpful to the jury because it bore no relation to the operating history of Lightning Lube's franchisees and thus was speculative. It is true that "[a]n opinion based on false assumptions is unhelpful in aiding the jury in its search for the truth, and is likely to mislead and confuse." *Wilkinson v. Rosenthal & Co.*, 712 F.Supp. 474, 479 (E.D.Pa. 1989). *See generally Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). But, as we explain below in regard to the sufficiency of the future damages evidence, we have determined that at least some of Venu-

to's assumptions were valid. His testimony thus was helpful to the jury. Given the broad discretion accorded to the district court concerning the admission or exclusion of testimony, we therefore cannot conclude that the district court erred in admitting Venuto's testimony.

### 2. Damages Not Proven With Reasonable Certainty

■ Even if the damage testimony was admitted properly, Witco argues that the evidence in this case did not permit a damage award for lost profits. According to Witco, the lost profits claimed were speculative because Venuto did not offer any documentary evidence comparing his operation to those of his competitors, did not discuss the market conditions for quick-lube centers generally, did not assess the impact of the stock market crash of 1987 on the likelihood of whether Lightning Lube would have gone public, and did not consider the impact of the 1990–91 recession on lube sales generally. More importantly, Witco argues that Venuto did not base his prediction of lost future profits on the number of cars processed by Lightning Lube in the past, but instead speculated that the number of cars serviced would increase every year. Thus, in Witco's view there was no basis for the conclusion that the franchisees would continue in business for the full ten-year term of their agreements, that more franchisees would join the chain, and that the franchisees would reap a substantial profit in the ten-year period even though none of them had been in existence for more than a year when the alleged tortious conduct began.

■ In assessing the merits of this argument, we must bear in mind two principles. First, it is well-settled in New Jersey that although the plaintiff bears the burden of proving that it has in fact been damaged, *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.*, 141 N.J.Super. 437, 358 A.2d 805, 814 (App.Div.), *certif. denied*, 71 N.J. 503, 366 A.2d 658 (1976), after the plaintiff has established an injury, it need prove the amount of damages only to a reasonable degree of certainty. *Tessmar v. Grosner*, 23 N.J. 193, 128 A.2d 467, 472 (1957). Thus, once the plaintiff

proves it has been damaged, it need not prove the amount of those damages with precision. "Where a wrong has been committed and damages have resulted, mere uncertainty as to the amount of damages will not preclude a recovery even though proof of the amount of damages is inexact." *Viviano v. CBS, Inc.*, 251 N.J.Super. 113, 597 A.2d 543, 551 (App.Div.1991), *certif. denied*, 127 N.J. 565, 606 A.2d 375 (1992).

■ Additionally, New Jersey no longer adheres to its "new business rule" which, as embodied in several older New Jersey cases, indicated that lost profits of a new business are too remote and speculative to permit an award of damages. *See, e.g., Weiss v. Revenue Bldg. Loan Ass'n*, 116 N.J.L. 208, 182 A. 891 (1936); *Adrian v. Rabinowitz*, 116 N.J.L. 586, 186 A. 29 (Sup.Ct.1936). In *In re Merritt Logan, Inc.*, 901 F.2d 349, 357–58 (3d Cir.1990), we predicted that the New Jersey Supreme Court would abandon the "new business rule" in favor of permitting the recovery of such damages if proven with reasonable certainty. Shortly thereafter, the New Jersey Supreme Court confirmed this prediction in *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 129 N.J. 479, 610 A.2d 364, 379 (1992), in which that court, in permitting a renovated casino to recover lost future profits as a new business, cited *In re Merritt Logan*. While we recognize that *Perini* involved damages awarded in an arbitration, we believe that the Supreme Court of New Jersey would apply its holding to trials in court as well.

Applying these principles to this case, we conclude that Lightning Lube established the amount of damages to a reasonable certainty. While it may be that Venuto's testimony could not have sustained an award of $70 million in future lost profits, nonetheless the jury could have concluded reasonably that Lightning Lube would have earned $7 million over the ten-year period.

In challenging this assessment, Witco argues that Venuto's estimate of $28,000 in expected royalties per center after four years was unrealistic, because each center would have to handle 50 cars a day to reach that number, and there was no evidence to show that any of Lightning Lube's centers

achieved that kind of business during its existence. While this argument may be true, the jury did not have to accept Venuto's projection of $28,000 to reach its award.[12] The jury could have concluded that in its first year Lightning Lube received approximately $333,200 in total royalties.[13] Venuto testified that he had sold over 170 contracts, but only 35–40 franchises actually opened because of Witco's tortious acts. In order to reach its award of lost profits the jury thus could have assumed that if 34 existing franchisees provided Lightning Lube with $333,200 in royalties, Lightning Lube merely would have had to get several more of those already sold to open and then achieve only a modest growth over its centers' first year rate of quick-lube jobs. Such an estimate is very conservative, considering Venuto's testimony, and bears some relation to the facts to which he testified. Thus, the jury need not have assumed that Lightning Lube would have sold more contracts or that its franchisees each would have generated $28,000 in royalties a year.

Additionally, the jury may have found Venuto's projections of future profits particularly credible because he testified without contradiction that in its first year of operations, the profitability and growth of Lightning Lube surpassed his projections. Actual first-year revenue per franchisee was 40% higher than Venuto had expected. Having found his earlier projections to have been conservative, the jury may have believed that his future projections merited great weight as well. *See In re Merritt Logan, Inc.*, 901 F.2d at 358 (in considering sufficiency of lost profits testimony, court found it noteworthy that plaintiff's sales in first week actually exceeded its projections).

It is also notable that, contrary to Witco's assertions, Venuto did account for the effect of the recession when he explained that it would not reduce the number of automobiles on the road in need of oil maintenance. From his testimony, the jury could have inferred reasonably that although the recession would have prevented consumers from purchasing new cars, they still would need to obtain quick-lube jobs for their current vehicles. In fact, a Witco document expressly projected increased lube sales on the assumption that older vehicles needed more oil maintenance than newer cars. Thus, it would have been reasonable for the jury to conclude that if the recession forced consumers to retain their current automobiles, they would require more lube jobs. In this regard, the jury also heard testimony that quick-lube centers in general were expected to continue to grow because of the increase in self-service gasoline stations and the withdrawal of the oil companies from providing complete automobile service.

There also was testimony that Lightning Lube was the fastest growing quick-lube franchise in the United States. In the Delaware Valley it was larger than Jiffy Lube, the largest quick-lube franchisor in the country. Furthermore, even disregarding Venuto's testimony there was other testimony to support an inference that Lightning Lube had a value of at least $7 million, because Tom Peppelman, of P & M Oil, the Exxon supplier, testified that in August 1987 he had considered paying that amount to purchase Lightning Lube.

Given the relative liberality of New Jersey damages law, we therefore think Lightning Lube has satisfied its burden in establishing the amount of its damages. We recognize that in our analysis we are not basing an award of lost profits solely on the past year's performance as we did in *In re Merritt Logan Inc.* In that case, the plaintiff produced evidence that it exceeded a contemplated figure of $130,500 in weekly sales before the defendant breached its contract. It then projected that it would have continued to make this amount of sales absent the breach. Here, however, we are determining that the record supported not only a conclusion that

---

**12.** Moreover, Lightning Lube did present a report from one center that on a particular Saturday it handled 56 cars.

**13.** The record indicates that in its first year 34 Lightning Lube franchisees opened and that they each grossed an average of $140,000. At the 7% royalty rate, the royalty per location should have been $9,800 which would equal approximately $333,200 in total royalties for the 34 franchises.

Lightning Lube would have continued to make $333,200 in royalties but that it would have more than doubled its revenues. Although this conclusion might appear to be somewhat speculative, in light of this record, we find the award is supported adequately.

### D. MISCONDUCT BY LIGHTNING LUBE'S COUNSEL

In its final challenge, Witco contends that the district court erred in its treatment of misconduct by Lightning Lube and its trial counsel, Steven Kramer. More specifically, Witco focuses on attempted witness tampering by Kramer. During the course of the trial, Kramer contacted Robert Roe and Rufus Knowlin, former Lightning Lube franchisees, who were going to testify against Venuto, and Irving Pollack, whose wife was a Lightning Lube franchisee and who was also expected to testify adversely to Lightning Lube.

Kramer telephoned Pollack and told him that it would not be in his wife's interest to testify against Lightning Lube, because if Lightning Lube won it would pay the franchisees to whom Venuto owed money out of the award. Kramer further threatened that if his wife testified adversely to him and he lost, Venuto would sue her. Kramer approached Robert Roe in the bathroom of the courthouse, prior to Roe's testimony, advising him that Venuto intended to pay his promissory note to Roe if Lightning Lube won. Finally, Kramer telephoned Rufus Knowlin, saying he wanted to discuss a settlement of franchise fees which Knowlin owed.

When the district court became aware of these tactics, it conducted a *voir dire* of these witnesses outside the presence of the jury. All of the witnesses denied that Kramer's overtures had intimidated them and claimed that they would not change their expected testimony. Indeed, all three testified adversely to Lightning Lube at the trial. Following the *voir dire*, the district court found:

> Mr. Kramer's approach to the witnesses was done to improperly influence their testimony adversely to Witco. The circumstances surrounding his approach to the witnesses, the timing of opening settlement discussions of a witness's claim against Lube on the eve of trial and Mr. Knowlin's own evaluation of Mr. Kramer's conduct all serve to depreciate Mr. Kramer's dissembling disavowal of an errant motive.

802 F.Supp. at 1201 n. 10. But based on the demeanor of the witnesses, the district court further determined that "there is no indication that their testimony was 'chilled' or altered by Mr. Kramer's importuning them." 802 F.Supp. at 1201.

Witco moved for an immediate mistrial or, in the alternative, for permission to call Kramer to the stand before the jury to examine him about his contacts with the witnesses. The district court denied both motions. However, it permitted the three witnesses to testify about what Kramer told them, although not what they perceived to be his intentions. The district court also instructed the jury that it could infer, based on Kramer's conduct, that Lightning Lube did not have confidence in its case. *See Newark Stereotypers' Union v. Newark Morning Ledger,* 397 F.2d 594, 599 (3d Cir.1968) (recognizing that "an attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false"), *cert. denied,* 393 U.S. 954, 89 S.Ct. 378, 21 L.Ed.2d 365 (1969).

Witco now argues, as it did before the district court in seeking a new trial, that the district court should have granted a mistrial, or at the very least permitted Witco to call Kramer as a witness and examine the three witnesses as to their perceptions of what Kramer intended when he contacted them.

### 1. *Mistrial*

We do not ignore the seriousness of Kramer's attempt to interfere with opposing witnesses. This conduct threatened to undermine the integrity of the trial proceedings and demonstrated a complete disregard of his obligations as an officer of the court. However, in considering the district court's refusal to grant a mistrial because of this misconduct, we must keep in mind our limited scope of review. Our standard of review with respect to the grant of a new trial for

prejudicial conduct by counsel is deferential. *Fineman*, 980 F.2d at 207. "We recognize that the trial judge has considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial." *Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3d Cir.1978) (citations omitted). The trial judge is entrusted with wide discretion " 'because he is in a far better position than we to appraise the effect of the improper [conduct] by counsel.' " *Fineman*, 980 F.2d at 207 (quoting *Reed v. Philadelphia, Bethlehem & New England R.R. Co.*, 939 F.2d 128, 133 (3d Cir.1991) (citations omitted)). When measured against this deferential standard, the district court's refusal to grant a mistrial did not constitute an abuse of discretion.

It is clear that no prejudice resulted to Witco from Kramer's attempted witness tampering, inasmuch as the witnesses themselves claimed under oath not to have felt intimidated; they testified adversely to Lightning Lube; and the district court made an express finding based on their demeanor that their testimony did not seem to have been altered by Kramer's overtures. Furthermore, we find it significant in assessing the risk of any prejudice to Witco that the witnesses testified before the jury as to the attempted witness tampering and the district court instructed the jury that it could draw an adverse inference against Lightning Lube based on this testimony. Thus, if anything, Witco benefitted from Kramer's conduct, inasmuch as it received the opportunity to damage his credibility and that of his client in front of the jury.

Additionally, Witco has not explained what benefit that it legitimately hoped to gain from a mistrial. Once the factor of possible prejudice is discarded, Witco's only argument is that because, after the lawsuit began, Lightning Lube issued promissory notes to many of the franchisees, telling them explicitly that they would be paid out of any judgment,[14] a mistrial would have enabled Witco to investigate whether Venuto or Kramer was responsible for the refusal of a number of former franchisees to testify or even be interviewed. But as the district court accurately noted, Witco knew prior to trial that many former Lightning Lube franchisees possessed promissory notes from Lightning Lube. Thus, Witco had ample opportunity during discovery to investigate whether prospective witnesses had been intimidated or inhibited by either Kramer or Venuto. Witco's speculation, which it raised only at trial, that Venuto may have dissuaded other witnesses from testifying favorably to Witco, does not support the grant of a mistrial. We therefore will defer to the district court's judgment that a mistrial was unnecessary.[15]

14. These promissory notes were in lieu of the refunds which he owed them upon their termination with his franchise.

15. We do not wish our opinion to be misunderstood. In its reply brief Witco contends that Kramer engaged in misconduct in other aspects of this litigation and that he "has a history of flouting court orders and the rules of professional conduct, whether in dealing with witnesses, juries, or in his vicious attacks on opposing counsel." Kramer in fact did engage in other improper conduct in this case and was sanctioned in the district court. Furthermore, it is true that the decisions in other cases have criticized Kramer's improper conduct. *See, e.g., Fineman*, 980 F.2d at 206–11; *Matthews v. Friedman*, 128 F.R.D. 194 (E.D.Pa.1989), aff'd, 919 F.2d 135 (3d Cir.1990); *Schwartz v. Hospital of the Univ. of Pa.*, 1989 WL 64286 (E.D.Pa.1989); *Fineman v. Armstrong World Indus., Inc.*, No. 84–3837, 1993 WL 414752 (D.N.J. July 29, 1993). In these circumstances, even though we do not think Witco was prejudiced by Kramer's conduct, it might well be that we simply should dismiss this action for reasons of deterrence and punishment. *See*

*Guyer v. Beard*, 907 F.2d 1424, 1429 (3d Cir. 1990) (under our jurisprudence district court may dismiss cases where party or counsel has "engaged in contumacious conduct" and where "the ends of justice would [not] be better served by a lesser sanction"). *See also TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir.1987) ("[c]ourts have inherent equitable powers to dismiss actions or enter default judgments for failure to prosecute, contempt of court, or abusive litigation practices"). *See Shea v. Donohoe Const. Co.*, 795 F.2d 1071, 1077 (D.C.Cir. 1986) (district court may dismiss case to "sanction conduct that is disrespectful to the court and to deter similar misconduct in the future" even absent showing of prejudice to other party). But after most careful consideration, we have decided not to take that step because the remedy for misconduct initially should be decided by the district court and that court did not dismiss the case. The message which we do not wish to send is that misconduct which is not prejudicial may never lead to a dismissal of a complaint or suppression of defenses. In some extreme cases a district court might determine that nothing short of dismissal or suppression would be an

### 2. *Refusal to Allow Kramer to Testify*

■ Witco also argues that the district court's refusal to allow Kramer to testify about the allegations of witness tampering is grounds for a new trial. We reject this argument for the same reasons as discussed above. Considering that the court gave a jury instruction adverse to Lightning Lube's case and that the witnesses testified about the tampering, which, as the district court put it, exposed the jury to "the full flavor of what transpired," it is difficult to imagine how Witco was prejudiced by the failure of Kramer to testify. Because we find that Kramer's testimony was not critical to Witco's case, we also hold that the court was well within its discretion not to disqualify Kramer from representing Lightning Lube in this case.

Witco argues that Kramer's cross-examination of these witnesses was fraught with leading questions which it likened to testimony that matched his credibility against theirs. But the district court found that Witco had ample opportunity to explore the witnesses' responses to Kramer's cross-examination and thus was not prejudiced. Accordingly, we will defer to the trial judge's assessment.

### 3. *Limiting the Witnesses' Testimony*

■ Witco argues that the district court handicapped its examination of the three witnesses by preventing it from asking them what they thought Kramer meant when he spoke with them. Witco claims that Kramer, in his cross-examination of the witnesses, convinced the jury of his good intentions because in his out-of-court encounters he carefully had avoided asking explicitly that the witnesses not testify or slant their testimony. According to Witco, the effect of that "bit of disingenuousness" could have been vitiated only by asking each witness what he understood Kramer was communicating. Thus, only by permitting lay opinion testimony pursuant to Fed.R.Evid. 701 could Kramer's credibility be evaluated properly. Relying on our holding in *United States v. Dicker*, 853 F.2d 1103, 1109 (3d Cir.1988), the district court held that the witnesses' interpretation of what they thought Kramer meant was adequate response to an attorney's or a party's

inadmissible because his statements, as recounted to the jury, were clear.

In *United States v. De Peri*, 778 F.2d 963, 977–98 (3d Cir.1985), we held that a police officer's explanations of cryptic remarks made in tape recorded conversations between drug traffickers were admissible under Fed. R.Evid. 701 because they rationally were based on his perception of the conversation and helpful to the trier of fact. In *Dicker*, however, we explained that *De Peri* did not authorize the admission of all opinion testimony regarding the substance of a recorded or recalled conversation. Rather, such testimony is admissible only to assist in the jury's interpretation of coded portions of the conversation. 853 F.2d at 1109. But we held that where the statements are clear, such opinion testimony is not helpful to the trier of fact and is inadmissible under both Rules 701 and 702. Thus, under the facts of that case, we found that a customs agent should not have been allowed to interpret a defendant's potentially legitimate reference to export certificates as "phony documents" when the reference was clear and straightforward.

Similarly, in this case, regardless of what Kramer intended by his comments to the three witnesses, the comments, as recounted by those witnesses, were in themselves clear and straightforward, and thus we cannot say that the district court erred in holding that they did not need clarification by way of the witnesses' interpretations. The testimony of the witnesses accurately conveyed to the jury Kramer's words, which strongly suggested Kramer's intent to influence them and which further suggested Kramer's lack of confidence in Lightning Lube's case. Thus, even without the witnesses' lay opinion as to Kramer's intent, the jury was very likely to draw inferences from the witnesses' testimony against Lightning Lube. In addition, the court's special instruction to the jury advising it that any such negative inferences which it might make would be permissible, as well as Witco's closing argument, mitigated any remotely arguable prejudice to Witco.

misconduct.

### 4. General Prejudice Claim

Aside from its contention that it is entitled to a new trial because of Kramer's attempted witness tampering, Witco also argues that the district court, having recognized that other misconduct by Kramer [16] and other trial errors caused Witco enough prejudice to necessitate a new trial on punitive damages and fraud, erred in not granting a new trial on Lightning Lube's other claims on that basis. In granting a new trial on punitive damages, the district court noted that it had erred in permitting the admission of evidence from Lightning Lube of statements attributable to Witco implying that Witco filed a counterclaim against Lightning Lube merely to destroy its business. Samuel Kleger, Lightning Lube's vice-president, testified that after Lightning Lube filed suit against Witco, John Bain, a lawyer for Witco, threatened that "we'll bury you." In addition, Venuto testified that after Witco filed its counterclaim, Benjamin Liebowitz, a Witco attorney, "kind of laughed at me, says [sic], you can't sell no [sic] franchises now can you Ralph?" This evidence was offered by Lightning Lube in an attempt to demonstrate the malice and "evil minded acts" necessary to support its claim for punitive damages based on the counterclaim.

In granting Witco a new trial on punitive damages, the district court ruled that the evidence of these statements should not have been admitted over Witco's objections, because Lightning Lube failed to adduce proof that Witco ratified or authorized these statements. 802 F.Supp. at 1198–99. Furthermore, in the court's view, the statements could not have been authorized implicitly because they were not related to the management of the litigation. *Id.*

The district court further held that Venuto's "contrived efforts (even after judicial admonition) to appeal to the sympathy of the jury" through emotional displays inflamed the jury and provided an additional reason to set aside the punitive award. "Mr. Venuto's persistent theatrical displays—tears, raised eyebrows and facial grimaces—all done to arouse undue passion and prejudice, effectively impeded defendant's chance for a fair trial." *Id.* at 1200.

Additionally, in granting a conditional new trial on two of the fraud claims, the district court determined that it had erred both in giving over Witco's objection a "missing witness" charge, and in permitting Lightning Lube to argue on summation that a Witco word processor who typed the Avis–Witco partnership draft agreements was a missing witness who the jury should presume would have failed to support Witco's claim as to why the wrong dates appeared on those documents. *Id.* at 1190. The district court concluded that there was no such witness and that the jury could have predicated its fraud verdict on a presumption not based on evidence of record, but simply on the unfounded speculation of Lightning Lube's counsel. *Id.* The court also found that none of the evidence presented at trial reasonably supported Lightning Lube's Avis–Witco conspiracy theory of fraud.

Witco now argues that the prejudice from these errors spilled over into the rest of the verdict, and thus the court should have granted a new trial as to the entire case. This argument is without merit. All of these errors related to whether Witco acted with the requisite malice to entitle Lightning Lube to punitive damages, and at most were only related remotely to the question of liability on the tortious interference and contract claims. Indeed, the missing witness instruction and reference by Kramer to that "witness" during summation concerned the timing of the Avis–Witco partnership agreement, an issue germane only to the fraud claim. The missing witness error thus could not have affected the jury's deliberations on the contract and tortious interference claims. Similarly, the threatening statements by Wit-

---

**16.** With regard to other incidents of Kramer's misconduct at trial, the district court found that Witco failed to object in a timely fashion, *i.e.,* contemporaneously to Kramer's alleged improper remarks. Witco argues that where the improprieties are so pervasive as to make repeated objections futile, a new trial is in order despite the failure on the part of the moving party to timely object. Witco also argues that the pervasive abuse of the judicial process by Lightning Lube and by its counsel entitles Witco to judgment as a matter of law. We find these arguments unpersuasive.

co's lawyers related to Witco's malice in filing the counterclaim. This issue was irrelevant to the breach of contract claim and could not have affected the jury's deliberations as to the issue of tortious interference, inasmuch as there was more than sufficient evidence to establish Witco's liability on this claim. Likewise, we believe that Venuto's conduct in trying to get sympathy from the jury would not have affected the compensatory damages award which was supported fully by the evidence.

We also note that a jury's determination of punitive damages invariably involves a much more emotional decisionmaking process than does its determination of liability and compensatory damages. In awarding punitive damages, the jury in a sense vents society's collective anger. "Punitive damages ... serve to express the community's disapproval of outrageous conduct—the 'admonitory' function." *Fischer v. Johns–Manville Corp.*, 103 N.J. 643, 512 A.2d 466, 473 (1986). For this reason, they have been described as a " 'display of ethical indignation.' " *Id.* (citation omitted). Thus, it stands to reason that a jury is much more susceptible to being inflamed when considering a punitive award than it would be in formulating a liability or compensatory damages verdict. In a recent case the Supreme Court of New Jersey recognized a jury's increased vulnerability to inflammatory tactics when assessing punitive damages:

> We have proceeded with an appreciation that at the core of punitive damages lurks a volatile dilemma: the same findings necessary for the award of punitive damages can incite a jury to act irrationally. A condition precedent to a punitive damages award is the finding that the defendant is guilty of actual malice. The purposes of the award—the deterrence of egregious misconduct and the punishment of the offender—when mixed with a finding that the defendant is malicious, can readily inflame an otherwise-dispassionate jury.

*Herman v. Sunshine Chem. Specialties, Inc.*, 133 N.J. 329, 627 A.2d 1081, 1085 (1993) (citation omitted).

Given that a jury's approach when considering punitive damages is so volatile, we think it not unlikely that an evidentiary error which could prejudice a defendant in regard to the jury's determination of punitive damages, would not affect determinations on liability or the quantum of compensatory damages. For this reason, and given the record before us, we find that the district court did not abuse its discretion in concluding that, although the wrongful admission of the evidence and the misconduct by Kramer and Venuto could have inflamed the jury during its deliberation of punitive damages, they did not affect its determination of the other claims. We thus will affirm on this point.

## IV. LIGHTNING LUBE'S CROSS–APPEAL

### A. FRAUD

In its cross-appeal, Lightning Lube first challenges the district court's grant of judgment as a matter of law and a conditional new trial to Witco on Lightning Lube's claims that Witco committed fraud by not disclosing its intent to compete against Lightning Lube in a joint venture with Avis and misrepresenting its intent at the time of entering into the contract with Lightning Lube not to fulfill that contract. The jury awarded Lightning Lube $1 million in compensatory damages on each of these claims. Because we will affirm the district court's grant of judgment as a matter of law on the two fraud claims, we need not address the district court's alternative holding granting a conditional new trial on them.

The elements for actionable fraud under New Jersey law are proof that the defendant made (1) a material misrepresentation of present or past fact (2) with knowledge of its falsity (3) with the intention that the other party rely thereon (4) and which resulted in reasonable reliance by plaintiff. *Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 432 A.2d 521, 524 (1981). Depending on the remedy sought, an action for fraud may be either legal or equitable in nature. *Jewish Ctr.*, 432 A.2d at 524. A plaintiff asserting a claim of legal fraud must show that the defendant acted with scienter, *id.*, but only need prove the elements of fraud by a preponderance of the evidence.

*Batka v. Liberty Mut. Fire Ins. Co.*, 704 F.2d 684, 688 (3d Cir.1983). In contrast, a plaintiff advancing a claim of equitable fraud need not demonstrate scienter, *Jewish Ctr.*, 432 A.2d at 524, but must establish the other elements of fraud by clear and convincing evidence. *Batka*, 704 F.2d at 688. Because Lightning Lube alleged fraud to recover money damages it was required to prove that Witco acted with scienter, but it was held only to the preponderance standard as to all the elements of fraud.

### 1. *Nondisclosure of Intent to Compete*

■ The crux of Lightning Lube's nondisclosure claim was its contention that Witco and Avis already had agreed to form a joint venture, or at least were negotiating to that end, before the spring of 1986, when Lightning Lube and Witco reached an agreement. Thus, according to Lightning Lube, Witco knew before it reached its agreement with Lightning Lube that it would be competing against it. Lightning Lube asserted that had it known of the alleged negotiations between Witco and Avis, it never would have made its arrangements with Witco in May 1986. In attempting to prove the timing of the Witco–Avis agreement, Lightning Lube conceded that Avis and Witco officially announced their venture in December 1986, but it offered documents which were purportedly drafts of the partnership agreement and were dated January 1986, and April 1986, respectively. (PX 18 and 18A). The district court stated that only the cover letters on these documents were dated 1986, and that the internal pages were dated 1987. But our examination of the drafts indicates that every page of the supposed partnership drafts was dated 1986 at the lower right corner and that the cover pages were dated 1987. In addition, Lightning Lube submitted handwritten notes by Harvey Golublock, a Witco vice president, dated "4/21/86" and referring to an "April 14" draft agreement between Witco and Avis.

In an effort to contradict Lightning Lube's theory that Witco–Avis negotiations were underway as early as January 1986, Witco called Jeffrey A. Baumel, an attorney from the New York law firm of Bachner, Tally,

Pollavoy and Mishin. Baumel testified that he drafted the partnership documents; that he did not join the firm as an associate until May 1986; and that he prepared the draft partnership documents from scratch based on a letter of intent (PX 591), prepared December 11, 1986, that was given to him by one of the partners. Baumel also testified that he saw nothing in the Witco file which indicated that another attorney at the firm worked on a partnership agreement between Witco and Avis before he did. Thus, he claimed that the partnership documents could not have been prepared before 1987.

Baumel did not dispute, however, that PX18 and PX18A were genuine, or that they were typed at his firm. Instead, he maintained that the dates of "1/13/86," and "4/14/86" must have been typing errors because he prepared the documents on January 13, 1987, and April 14, 1987.

Golublock initially testified during his examination by Lightning Lube that the partnership documents were typed by a word processor at Witco. But, during his cross-examination by Witco, he changed his testimony, claiming his initial statement was based on a misunderstanding of Kramer's question. He then claimed that in 1986 Witco did not have word processing capabilities and thus the drafts must have been typed at Baumel's law firm. Golublock further testified that the date on the handwritten notes was a mistake, and that he meant April 14, 1987. In order to support this claim, he pointed out that the handwritten notes refer to a center in Elmont, N.Y., that the Witco–Avis joint venture was planning to open. The notes state that the venture had just obtained a building permit. Witco's counsel showed Golublock a copy of the building permit, which was dated April 1987. Thus, Witco argued that because the permit to which the notes referred was dated 1987, the notes must have been written in that year.

In its opinion, the district court ruled that the evidence introduced by Lightning Lube did not alone support a finding of fraud. 802 F.Supp. at 1187. The court also found that Baumel's testimony rendered Lightning Lube's theory of an Avis–Witco deal before December 1986 implausible. *Id.* In addi-

tion, the district court held that even if the evidence was sufficient to support an inference that the partnership agreements were drafted in 1986, Witco was not acting as a competitor of Lightning Lube's by participating in the joint venture with Avis because its only role was to finance real estate acquisitions. Thus, Witco had no duty to disclose its intent to join the venture because its contract with Lightning Lube did not prohibit Witco from providing such financing. *Id.* at 1188.

At first glance, it might seem from its discussion that the district court impermissibly weighed the evidence or passed on the credibility of Witco's witnesses in determining that Witco's evidence refuted that of Lightning Lube's. But after carefully studying the record, we conclude that the court appropriately exercised its authority. We recognize that the question before the district court in deciding the motion for judgment was not whether the evidence offered by Witco was more credible or had more weight than that offered by Lightning Lube, but whether Lightning Lube offered sufficient evidence for a reasonable jury to conclude that an Avis–Witco partnership agreement had been reached or contemplated prior to December 1986. *See Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir.1976), ("[a]t least two factors are outside the perimeters of" a district court's determination of a motion for judgment, "the credibility of the evidence and the weight of it"), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). Thus, "a trial judge, when deciding on a motion for [judgment] should not determine whether the evidence 'preponderates' but must confine himself to ascertaining whether the party against whom the motion is made adduced sufficient evidence to create a jury issue." *Id.* (citations omitted).

On the other hand, the mere fact that Lightning Lube adduced *some* evidence will not suffice for it to overcome the order granting judgment in Witco's favor. What the Supreme Court instructed in the analogous situation of summary judgment holds true here: "[i]f the evidence is merely colorable, or is not significantly probative," the court must grant judgment to the movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Thus, the motion for judgment should "not be granted only where there is a complete absence of probative facts to support a jury verdict." *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir.1969). Rather, "there must be a conflict in *substantial evidence* to create a jury question." *Id.* (emphasis added). Accordingly, the trial court does not substitute its interpretation of the facts for the jury's when it determines that the record is devoid of the minimum amount of evidence from which the jury reasonably could have reached its decision.

In this case, we agree with the district court that the record is devoid of legally sufficient evidence that the Avis–Witco agreement was reached or contemplated prior to May 9, 1986. The fact that Golublock's notes refer to a building permit obtained the week before and that Witco produced at trial a permit dated April 1987, conclusively establish that Golublock's notes were written in 1987, not 1986. It therefore follows that the notes' references to a draft of the partnership agreement having been completed recently can signify only that the draft agreements produced by Lightning Lube were indeed written in 1987, despite the dates to the contrary on its interior pages. It is also noteworthy that the letter of intent between Avis and Witco with respect to their agreement is dated December 11, 1986. We cannot conceive that negotiating parties would first draft a contract, and then draft the letter of intent.

Moreover, the 1986 dates on the draft Avis partnership agreements were contradicted by the 1987 dates on some of the cover pages. In fact, a part of PX 18A is a letter, dated April 24, 1987, by Baumel that states in relevant part: "I have enclosed two copies of a draft partnership agreement, reflecting additional changes received from our client yesterday." This letter thus conclusively indicates that PX 18A was drafted in April 1987. We therefore hold that no reasonable jury could have concluded that as of May 9, 1986, Witco had formed the intent to enter

into the quick-lube market as a competitor of Lightning Lube.

■ In any event, even if we disagreed with the district court's assessment of the proofs, our result would not be different. Inasmuch as Lightning Lube has not pointed to any representation by Witco that it would not participate in ventures with other quick-lube franchises, it has failed to show that Witco impermissibly deceived it. Despite its protestations to the contrary, Lightning Lube complains of a nondisclosure and not an affirmative misrepresentation.[17] But where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a "special relationship." *Berman v. Gurwicz,* 189 N.J.Super. 89, 458 A.2d 1311, 1313 (Ch.Div.1981) (duty of full disclosure may arise from one party's having made partial disclosure to other or from nature of transaction and relationship between them), *aff'd,* 189 N.J.Super. 49, 458 A.2d 1289 (App.Div.), *certif. denied,* 94 N.J. 549, 468 A.2d 197 (1983); *see also Jewish Ctr.,* 432 A.2d at 525 (where applicant for rabbinical position omitted mention of his prior criminal convictions on employment application, congregation stated proper claim of fraudulent concealment "because of the unique moral and spiritual relationship between clergy and congregation"); *Viviano v. CBS, Inc.,* 597 A.2d at 548 (recovery for fraudulent concealment requires proof that defendant legally was obligated to disclose); *Tele–Save Merchandising Co. v. Consumers Distrib. Co.,* 814 F.2d 1120, 1125 n. 2 (6th Cir.1987) (dissenting opinion) ("in the absence of a fiduciary relationship, nondisclosure does not constitute fraud under New Jersey law"); *Restatement (Second) of Torts* § 551 (requiring disclosure only where defendant knows information whose nondisclosure

will make earlier partial or ambiguous statement of facts to become misleading or where defendant is in a fiduciary or special relationship with plaintiff); W. Page Keeton, *Prosser & Keeton On the Law of Torts* § 106 at 738–40 (5th Ed.1984) (same).

■ Three categories of relationships give rise to a duty to disclose: (1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties. *Berman v. Gurwicz,* 458 A.2d at 1313. Witco's relationship with Lightning Lube, primarily a detached business relationship, does not fall into any of these categories. Indeed, neither party challenges the district court's finding that there was not a special relationship between Witco and Lightning Lube. Moreover, Lightning Lube and Witco did not expressly agree that Witco would not participate in a competing quick-lube venture. Likewise, the agreement cannot be understood implicitly to prohibit such participation by Witco, given that the agreement merely required Witco to sell oil to Lightning Lube at a particular price; to contribute payment for joint advertising; and to lend Lightning Lube money to buy equipment. These obligations do not create a partnership or joint venture from what are essentially buyer-seller and lender-borrower relationships. Thus, we will affirm the district court's grant of judgment on the twin grounds that insufficient proof exists as to a pre-December 1986 Witco–Avis agreement and that Witco did not have an affirmative duty to disclose the existence of its Avis venture to Lightning Lube.

17. As evidence of an affirmative misrepresentation, Lightning Lube points to testimony that Witco officials told Venuto that "nobody would be able to sell oil to any of [his] franchisees, which [Venuto] told them was very, very important" and that Witco did attempt to sell oil to the franchisees directly. But this evidence does not constitute proof of an affirmative representation by Witco that it would not compete with Lightning Lube by entering into a venture with another franchise. Rather, this evidence goes to the issue of Witco's alleged tortious interference with Lightning Lube. Similarly, we reject Lightning Lube's argument that a letter in which Richard E. Glady, Witco's Quick–Lube Program Manager, closed by stating "I want to thank you for your time and patience as we progress together in the Fast Lube business" is tantamount to an affirmative representation that Witco would not compete against Lightning Lube.

2. *Misrepresentation of Intent to Fulfill the Contract*

■ The district court granted Witco judgment as a matter of law on this count because it found that there was insufficient evidence of a fraudulent intent on Witco's part at the time of contracting to support the verdict. Lightning Lube premised its fraud theory on various breaches of contract committed by Witco subsequent to the agreement. In order to be the basis for an action for fraud, however, the alleged misrepresentation cannot be predicated simply upon a promise to perform that subsequently is unfulfilled. Rather, the plaintiff must prove by a preponderance of the evidence, that *at the time the promise to perform was made,* the promisor did not intend to fulfill the promise. *See Anderson v. Modica,* 4 N.J. 383, 73 A.2d 49 (1950); *Barry v. New Jersey State Highway Auth.,* 245 N.J.Super. 302, 585 A.2d 420, 424 (Ch.Div.1990). The "mere proof of nonperformance does not prove a lack of intent to perform." *Stochastic Decisions, Inc. v. DiDomenico,* 236 N.J.Super. 388, 565 A.2d 1133, 1137 (App.Div.1989).

Lightning Lube claims that it offered evidence of more than Witco's mere nonperformance of the contract to prove Witco's fraudulent intent at the time of contracting. Most notably, Lightning Lube cites to the jury's finding that Witco misrepresented the source of oil; the proof of the Witco–Avis partnership negotiations in 1986; Witco's acts of tortious interference; and Witco's failure to keep an alleged promise that it had made Venuto to provide real estate financing to Lightning Lube franchisees. This proof, however, does not demonstrate that Witco did not have an intent to fulfill the entire contract on May 9, 1986, when Venuto reached his agreement with Witco.

■ In regard to the misrepresentation of the source of oil, while the jury found liability against Witco, it expressly refused to award compensatory damages or even nominal damages predicated on this finding. The verdict sheet contained a space for the jury to indicate if its damages for the intent not to fulfill the contract were cumulative of those awarded elsewhere. Because the jury left this space blank, we can infer that it did not

base its award of $1 million for the intent not to fulfill the contract on an injury suffered to Lightning Lube as a result of the misrepresentation as to the source of oil. Accordingly, although Lightning Lube produced evidence to show that Witco did not intend to fulfill that particular portion of the contract at the time it was made, it did not establish any damages on that aspect of its case, and thus the source of oil fraud cannot sustain the $1 million dollars awarded on the intent not to fulfill the contract claim. Furthermore, the fact that Witco knew all along that it would not fulfill this discrete portion of the contract does not support an inference that Witco at the time of contracting intended to breach the entire agreement. Indeed, the evidence indicates that for the most part Witco adhered to the contract. The jury confirmed this by awarding Witco damages on its counterclaims for lack of payment by Lightning Lube for the equipment and oil supplied to it by Witco, and by finding that Witco sold it oil at the lowest available price.

■ Neither does Lightning Lube's claim of a conspiracy between Avis and Witco indicate that Witco had a fraudulent intent. As explained above, we find the proofs inadequate to demonstrate that prior to May 9, 1986, Witco and Avis had reached an agreement or contemplated their venture. But even if the evidence sufficed to place the drafting of the Avis–Witco partnership agreement as early as May 1986, the mere fact that Avis and Witco agreed to set up a venture to compete against Lightning Lube, in and of itself would not show that Witco did not intend to fulfill its contract with Lightning Lube. Witco's obligations under its agreement with Lightning Lube were not inconsistent with its obligations to the Avis joint venture.

■ Similarly, we do not find probative value with respect to the misrepresentation issue in the acts of tortious interference committed by Witco salespersons. Because these acts occurred after Witco reached its agreement with Lightning Lube, they do not establish that Witco had a fraudulent intent at the time the agreement was made. Rather, all they show is that at some subsequent

point Witco employees formulated an intent to harm Lightning Lube. Furthermore, inasmuch as Witco's management personnel contracted with Lightning Lube on Witco's behalf, the fact that its lower-level employees sought to disrupt the contract does not show that the corporation did not intend to adhere to the contract.

■ Finally, Witco's failure to provide real estate financing does not evince an intent not to fulfill the contract, inasmuch as the final agreement did not obligate Witco to provide such financing. Witco made the alleged promise to Venuto prior to the point at which the parties reached their ultimate understanding. The alleged promise was retracted at the May 9, 1986 meeting, when Witco disclaimed any desire to provide real estate financing. Accordingly, we will affirm the district court's grant of judgment as a matter of law on this claim.

## B. RICO

We consider next the propriety of the district court's dismissal of Lightning Lube's claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, for failing to satisfy the statute's pleading requirements. Under 18 U.S.C. § 1964(c), any person injured in its business or property by reason of a violation of section 1962 may recover treble damages and attorney's fees. In order to recover under section 1964(c) a plaintiff must plead (1) a section 1962 violation and (2) an injury to business or property by reason of such violation. *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1164 (3d Cir.1989).

In its amended complaint and RICO Case Statement, Lightning Lube alleged that Witco violated sections 1962(a)–(d) by conspiring with Avis to steal confidential information from Lightning Lube and by misrepresenting to Lightning Lube's franchisees that Light-

ning Lube did not own their equipment to persuade them to leave Lightning Lube. With respect to the confidential information, Lightning Lube claims that during Venuto's negotiations with Witco, Richard Glady, Witco's Quick–Lube Director, asked him for copies of his personal financial statements, and all of Lightning Lube's Operating and Training manuals which Venuto had prepared for the franchisees. Venuto testified that if he had known that Witco was setting up a competing venture with Avis, he never would have surrendered these materials; and thus Witco obtained them through fraud.[18]

Lightning Lube avers that the RICO "enterprise" is comprised of (1) the quick-lube joint venture between Avis and Witco; (2) the Avis/Kendall partnership known as K & A properties; (3) Witco and its Kendall Refinery Division; and (4) Avis. RICO Case Statement at 58–59. Lightning Lube names as the "persons" who violated the RICO statute: Witco, Kendall, and Avis. The purported predicate acts are mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and extortion in violation of 18 U.S.C. § 1951 and N.J.Stat.Ann. § 2C:20–5 (West 1982). We will address the sufficiency of Lightning Lube's allegations under each of the subsections of 1962 in turn.

### 1. *Section 1962(a)*

Section 1962(a) provides in pertinent part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of any unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of,

---

18. At trial, the district court, in granting judgment as a matter of law to Witco on Lightning Lube's unfair competition claim, found that Lightning Lube adduced no evidence showing that the information obtained by Witco rose to the level of trade secrets or that Witco even used this information in its joint venture with Avis. Because this finding was not made in connection with the same claims at issue here, and because

the court's earlier dismissal of the RICO claims was predicated only on the face of the pleadings, it would be unfair for us to find that the trade secret portion of Lightning Lube's RICO claims should have been dismissed in any case because of the district court's findings with respect to the unfair competition claim. Instead, we restrict our scrutiny to the sufficiency of Lightning Lube's pleadings.

any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).

■ "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Brittingham v. Mobil Corp.*, 943 F.2d 297, 303 (3d Cir.1991) (quoting 11 Cong.Rec. 35,199 (1970) (remarks of Rep. St. Germain) and 116 Cong. Rec. 607 (1970) (remarks of Sen. Byrd)). Under this section, a plaintiff must allege: (1) that the defendant has received money from a pattern of racketeering activity; (2) invested that money in an enterprise; and (3) that the enterprise affected interstate commerce. *Shearin*, 885 F.2d at 1165. Furthermore, the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. *Glessner v. Kenny*, 952 F.2d 702, 708 (3d Cir.1991); *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir.1990); *Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989). This allegation is required because section 1962(a) "is directed specifically at the use or investment of racketeering income, and requires that a plaintiff's injury be *caused by the use or investment of income* in the enterprise." *Brittingham*, 943 F.2d at 303 (emphasis added); *see also Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir. 1989) (recognizing that section 1962(a) "does not state that it is unlawful to *receive* racketeering income ... [rather] the statute prohibits a person *who has received* such income *from using or investing it* in the proscribed manner" (emphasis in original)), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989).

■ In this case, the RICO Case Statement alleges:

The enterprises, Kendall/Witco; the Avis–Kendall/Witco fast lube joint venture; K & A Properties, Inc; and the Avis defendants, have received the income derived from the pattern of racketeering activity in the instant matter.

The income which the enterprises have derived from their pattern of racketeering activity is the elimination of the plaintiff as a competitor in the fast lube market. Additionally, the enterprises have gained confidential and trade information possessed by the plaintiff as a fast lube franchisor that was used by the enterprises to compete directly against the plaintiff in the fast lube market. The destruction of the plaintiff as a fast lube competitor and the extraction of confidential and trade information from the plaintiff was utilized to facilitate the growth and success of the enterprises.

RICO Case Statement at 71–72. The district court held that these allegations did not satisfy section 1962(a)'s pleading requirements because they failed to explain how Lightning Lube was injured by the use or investment of racketeering income as opposed to the racketeering acts themselves. Instead, Lightning Lube's 1962(a) allegations merely repeat the crux of its allegations in regard to the pattern of racketeering; namely, that the defendants lied to the franchisees and stole Lightning Lube's trade secrets to eliminate Lightning Lube as a competitor. We agree with the district court's ruling in this regard.

According to Lightning Lube, Witco's theft of its trade secrets constitutes racketeering income and the investment of that income injured Lightning Lube because Witco used these stolen trade secrets to build a competing business which then hurt Lightning Lube's sales. In essence, then, Lightning Lube contends that the use of "income"—*i.e.,* the trade secrets—stolen from Lightning Lube through fraud permitted Witco to establish its "enterprise." However, we have recognized repeatedly that this type of allegation—that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff—is insufficient to meet the injury requirement of section 1962(a). In such situations, we have held that the fact that a plaintiff claims that the injury allegedly perpetrated on it would not have occurred without the investment of funds from the initial racketeering activity does not change the fact the plaintiff's alleged injury stems from the pattern of racketeering, and not from the investment of funds by the defendant.

For example in *Brittingham v. Mobil Corp.*, 943 F.2d at 304–05, we affirmed the district court's dismissal of section 1962(a) claims by consumers who bought garbage bags based on misrepresentations that they were biodegradable. The complaint claimed injury from the use or investment of racketeering income because the money derived from the sale of the garbage bags permitted the enterprise to continue its operations. We held that such an allegation did not state an injury cognizable under section 1962(a); rather it merely alleged the same injury caused by the pattern of racketeering. In so holding, we stated that if the mere reinvestment of racketeering income

> were to suffice [as an injury under section 1962(a) ], the use-or-investment injury requirement would be almost completely eviscerated when the alleged pattern of racketeering is committed on behalf of a corporation. RICO's pattern requirement generally requires long-term continuing criminal conduct. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Over the long term, corporations generally reinvest their profits regardless of the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiffs' reinvestment injury concept were accepted, almost every pattern of racketeering by a corporation would be actionable under § 1962(a) and § 1962(c) would become meaningless.

943 F.2d at 305.

Similarly, in *Glessner v. Kenny*, 952 F.2d at 708–10, we held that a complaint failed to state a section 1962(a) claim where the plaintiffs, a class of consumers who purchased allegedly defective residential oil furnaces from the defendant manufacturer, claimed an investment injury because the manufacturer was allowed to continue in business as a consequence of income derived from earlier frauds. Again, we found such an injury merely resulted from the reinvestment of funds obtained from the pattern of racketeer-

ing and thus more appropriately was remedied by section 1962(c), rather than section 1962(a). As we pointed out, "[i]f investment injury is construed as broadly as plaintiffs suggest, the distinction between sections 1962(a) and 1962(c) would be blurred." *Id.* at 709; *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

Lightning Lube seeks to circumvent these cases by distinguishing between the reinvestment of monies obtained by fraud and the reinvestment of proprietary information obtained through misappropriation. However, we see no principled basis to draw such a distinction. In both situations, the real injury to the plaintiff is the theft of its property—whatever form it is in—and not the investment of that property in an otherwise legitimate business.

Therefore, we agree with the reasoning of the district court in *R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 1991 WL 212180, at *5 (N.D.Ill. Oct. 7, 1991), which addressed the issue of whether the misappropriation of proprietary information by a competitor satisfies the investment injury requirement of section 1962(a), but reached a conclusion opposite from that suggested by Lightning Lube. The district court in *R.E. Davis* concluded that the actual injury of which complaint was made was the act of misappropriation, and not the use of the information by the competitor, and that, as with the taking of money through fraud, the appropriate remedy was under section 1962(c), not section 1962(a). As we agree with *R.E. Davis*, we will affirm the district court's dismissal of Lightning Lube's claim under section 1962(a).

### 2. *Section 1962(b)*

Under section 1962(b), it is unlawful

> for any person through a pattern of racketeering activity or through a collection of a unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b). In order to recover under this section, a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts. *Banks v. Wolk,* 918 F.2d at 421; *Helman v. Murry's Steaks, Inc.,* 742 F.Supp. 860, 882 (D.Del.1990); *Leonard v. Shearson Lehman/American Express, Inc.,* 687 F.Supp. 177, 181 (E.D.Pa.1988): "Such an injury may be shown, for example, where the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of his enterprise." *Casper v. Paine Webber Group, Inc.,* 787 F.Supp. 1480, 1494 (D.N.J. 1992). In addition, the plaintiff must establish that the interest or control of the RICO enterprise by the person is as a result of racketeering. *Banks v. Wolk,* 918 F.2d at 421. It is not enough for the plaintiff merely to show that a person engaged in racketeering has an otherwise legitimate interest in an enterprise. Rather, it must be established firmly that there is a nexus between the interest and the alleged racketeering activities.

■ In its RICO Case Statement, Lightning Lube alleged that Witco violated § 1962(b) because:

> [b]oth defendants Kendall/Witco and the Avis defendants maintain an interest or control in the enterprise of the Avis–Kendall/Witco fast lube joint venture. The joint venture enterprise is an enterprise that is engaged in interstate commerce through the nation-wide marketing and sale of Avis Lube fast lube franchises. Kendall/Witco provides financing and through its Kendall Refining Division, technical support to Avis Lube franchisees. The Avis defendants market and franchise Avis Lube as the franchisor....
>
> The entity 'Kendall/Witco,' under Section 1962(b), is both the liable 'enterprise' and the 'person'. Kendall/Witco is the 'person' conducting its affairs. Its employees are committing the illegal acts and those acts are for the ultimate benefit of the corporation.

RICO Case Statement at 72–73.

Noting that Lightning Lube had alleged that the corporate defendants were both "persons" and "enterprises" under section 1962(b), the district court dismissed the claim because it found it "difficult to understand how a corporation can acquire or maintain an interest in itself through a pattern of racketeering activity." Opinion at 9. Thus, the district court held that section 1962(b) requires that the defendant "person" and "enterprise" be distinct entities.

We previously have held that the "person" charged with a violation of section 1962(c) must be distinct from the "enterprise," *Hirsch v. Enright Refining Co.,* 751 F.2d 628, 633–34 (3d Cir.1984), but that there is no such requirement under section 1962(a). *Petro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349, 1360 (3d Cir.1987). In *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 907 (3d Cir.1991), we stated in passing that "[w]here, as here, a corporate 'person' is also the 'enterprise' through which the alleged racketeering activity occurred, liability can arise only under sections 1962(a) or (b)." Yet, inasmuch as the plaintiff in that case advanced claims only under sections 1962(a), (c), and (d), our reference to section 1962(b) was dicta. Thus, notwithstanding any suggestion by *Genty* that we are not inclined to require a distinction between the "enterprise" and "person" liable under section 1962(b), the issue still remains open in this circuit.

Other courts of appeal have split on this issue. The Courts of Appeal for the Seventh Circuit and Ninth Circuit have held that section 1962(b), unlike section 1962(c), permits a corporation to act as both the "person" liable and the alleged RICO enterprise. *See, e.g., Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1307 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *Schreiber Distrib. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1397–98 (9th Cir. 1986). The Court of Appeals for the Second Circuit has indicated that it is inclined to reach the opposite result. *See Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 668 (2d Cir.1989) ("In sum, the district court was correct in dismissing outright the claims against Kable insofar as they were based on § 1962(c). Although we suggest

the same conclusion would follow, for similar reasons, with respect to a claim against Kable based on § 1962(b), on the complaint before us, we cannot make that distinction."); *see also Jacobson v. Cooper*, 882 F.2d 717, 719 (2d Cir.1989) (assuming, without deciding, that "enterprise" and "person" must be separate for purposes of section 1962(b)).

We need not resolve this issue now, however, because even if we held that the district court erred in holding that Witco could not be both the person and enterprise under section 1962(b),[19] we would not change the district court's result as it is clear that in any case Lightning Lube has failed to state a section 1962(b) claim. We can affirm a correct decision on a ground different than that relied on by the district court. *Wittekamp v. Gulf & Western, Inc.*, 991 F.2d at 1143. Therefore, although it was not a reason for the district court's decision, we will affirm its order granting summary judgment to Witco on the section 1962(b) claim on the basis of Lightning Lube's failure to allege how the "acquisition of interest" and "control" of the enterprise by Witco injured Lightning Lube.

As stated above, a well-pled complaint under section 1962(b), just as with section 1962(a), requires the assertion of an injury independent from that caused by the pattern of racketeering. Here, Lightning Lube alleges in terms of a section 1962(b) injury that the employees of Witco are engaged in a pattern of racketeering. RICO Case Statement at 73. Such an allegation clearly is insufficient because it merely parrots the same injury that section 1962(c) is meant to remedy and fails to explain what additional injury resulted from the person's interest or control of the enterprise.

Furthermore, Lightning Lube's RICO pleadings fail to "allege a specific nexus between control of any enterprise and the alleged racketeering activity, as is required under section 1962(b)." *Banks v. Wolk*, 918 F.2d at 421; *see also Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d at 1168 n. 2. Instead, Lightning Lube merely avers that Witco and Avis maintain an interest in themselves and the joint venture. RICO Case Statement at 73. This allegation does not explain how such an interest is the result of racketeering as opposed to an interest derived from Witco and Avis's legitimate activities, and is thus insufficient. We therefore will affirm the district court's dismissal of Lightning Lube's section 1962(b) claim.

### 3. *Section 1962(c)*

Section 1962(c) prohibits:

> any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Just as with its pleading with respect to section 1962(b), Lightning Lube has alleged that the enterprise and the person are the same entity with respect to section 1962(c). RICO Case Statement at 62. As stated above, this court has required that the "person" liable be distinct from the enterprise for the purposes of recovering under section 1962(c). *Hirsch v. Enright Refining Co., Inc.*, 751 F.2d at 633. Accordingly, the district court correctly ruled that Lightning Lube failed to satisfy section 1962(c)'s person/enterprise separateness requirement and that its claim must fail.

### 4. *Section 1962(d)*

Under section 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient. *Leonard v. Shearson Lehman/American Express, Inc.*, 687 F.Supp. at 182. Inasmuch as Lightning Lube has not established a viable claim under any of those subsections, its section 1962(d) claim must also fail.

---

**19.** We note that the district court granted summary judgment on Lightning Lube's section 1962(b) claim on February 19, 1991, several months before we issued our opinion in *Genty*.

## C. PUNITIVE DAMAGES

We turn finally to the question of whether the district court properly granted judgment as a matter of law to Witco on the jury's award of punitive damages.[20] Under New Jersey law, punitive damages are available " 'to punish [a defendant's] aggravated misconduct' and to deter similar misconduct in the future." *Fineman*, 980 F.2d at 196 (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 N.J. 37, 477 A.2d 1224, 1230 (1984) (citations omitted)). The New Jersey Supreme Court has made clear that "[t]o warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil minded act' or an act accompanied by a wanton and willful disregard for the rights of another." *Nappe v. Anschelewitz*, 477 A.2d at 1230. Thus, something more than the mere commission of a tort is required for punitive damages, regardless of whether the tort is grounded on strict liability or fault.[21] *Fineman*, 980 F.2d at 196; *Berg v. Reaction Motors Div.*, 37 N.J. 396, 181 A.2d 487, 496 (1962). Rather, only conduct which is *"especially egregious"* will justify such an award. *Fischer v. Johns–Mansville Corp.*, 512 A.2d at 472 (emphasis added); *see also Leimgruber v. Claridge Assocs. Ltd.*, 73 N.J. 450, 375 A.2d 652, 654 (1977) ("[p]unitive or exemplary damages are sums assessed when the wrongdoer's conduct is especially egregious"); *Security Alum. Window Mfg. Corp. v. Lehman Assocs. Inc.*, 108 N.J.Super. 137, 260 A.2d 248, 251 (App.Div.1970) (holding that punitive damages ordinarily may be awarded only " '[w]here the defendant's wrongdoing ... has the character of outrage frequently associated with crime' ") (quoting Prosser, *Torts* (3d ed. 1964), § 2 at 9)); *Restatement (Second) Torts* § 908, comment b (same).

In addition, punitive damages generally may not be assessed against a corporate employer for the wrongful acts of its employees unless someone "so high in authority as to be fairly considered executive in character" participated in the wrongful conduct or "specifically authorized" or "ratified" it. *Wrinkler v. Hartford Accident & Indem. Co.*, 66 N.J.Super. 22, 168 A.2d 418, 422 (App.Div. 1961); *see also McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 768 (3d Cir. 1990). The company official committing, approving or ratifying the act need not be the highest officer in the corporate hierarchy, but only must be "a person of such responsibility as to arouse the 'institutional conscience.' " *Doralee Estates, Inc. v. Cities Serv. Oil Co.*, 569 F.2d 716, 722 (2d Cir.1977); *see also Viviano v. CBS, Inc.*, 597 A.2d at 552.

---

**20.** Because we will affirm the order granting judgment to Witco on this claim, we need not decide whether the district court properly granted a conditional new trial. We do note, however, that inasmuch as we affirm those portions of the district court's order which granted judgment to Witco on two of Lightning Lube's fraud claims, we would affirm the grant of a new trial on punitive damages, even if we reversed the order granting judgment. We would be required to reach that result because it would be impossible for us to apportion the punitive damage award to the remaining claims in this case.

**21.** We find New Jersey law unclear as to whether the evidence necessary to establish a finding of actual malice for an award of punitive damages exceeds the threshold for demonstrating legal malice with respect to a claim of tortious interference or legal fraud. Although some Appellate Division cases, without expressly stating so, seem to assume as much in regard to legal fraud claims, *see, e.g., Stochastic Decisions, Inc.*, 565 A.2d at 1137–38, the New Jersey Supreme Court appears to have left it as an unanswered question. *See Fineman*, 980 F.2d at 197 (recognizing this uncertainty in regard to a claim of tortious interference); *Nappe v. Anschelewitz*, 477 A.2d at 1237 n. 3 (O'Hern, J., concurring) (recognizing this uncertainty in regard to claim of legal fraud: "The majority says 'it is especially fitting to allow punitive damage [sic] for actions as legal fraud, since intent rather than mere negligence is the requisite state of mind' ... Whether the threshold for punitive damages should be identical to that for compensatory damages is exactly the type of question we should resolve and not leave to the discretion of juries.") (citation omitted). Inasmuch as we conclude for reasons other than an insufficient showing of malice that the source of oil fraud and the various acts of tortious interference cannot sustain the punitive award in this case, we decline to predict whether the New Jersey Supreme Court would rule that establishing the wrongful and intentional conduct necessary for either legal fraud or tortious interference would entitle, as a matter of law, a plaintiff to a jury charge on punitive damages.

Witco does not dispute that if Lightning Lube established that the upper echelon management of Witco had the intent to destroy Lightning Lube or ratified a plan to accomplish that end, then a punitive award would be justified. Rather, Witco argues that there is no evidence showing that Witco's management participated in or knew of the acts of tortious interference perpetrated by its salespersons.

The district court agreed. In granting judgment as a matter of law, the district court found no evidence supporting Lightning Lube's allegation of a corporate strategy to put it out of business. Neither did the district court find any evidence that Witco's management authorized the misconduct by its employees that allegedly led to Lightning Lube's demise. 802 F.Supp. at 1196–97. The court found, at most, sufficient evidence to support the claim for tortious interference, specifically Corwin's attempted intimidation of three existing or potential franchisees to leave Lightning Lube, and Witco salesperson Scott Eyers' offer of free equipment to a Lightning Lube franchisee in North Carolina (Wieland incident). But the court found insufficient proof of a nexus between these activities of Witco employees and any conduct by Witco's management. *Id.* The court further held that even if the jury could have believed that Glady, the quick-lube national sales manager, was involved in the Wieland incident, a single tortious act is insufficient to prove management's knowledge and ratification of a sinister corporate scheme. *Id.* at 1197.

In challenging this assessment of the proofs, Lightning Lube raises more than a dozen reasons why the district court erred in finding a lack of participation or ratification by Witco's management, all of them without merit. We discuss only those contentions which require further analysis.

1. *Ratification or Authorization*

 Lightning Lube first argues that top Witco management officials participated in the wrongdoing by "knowledgeable inaction" because they had seen memoranda indicating that Witco salespersons were interfering tortiously with Lightning Lube's businesses, but

did nothing to stop this activity. *See Miller v. Apartments & Homes of N.J., Inc.,* 646 F.2d 101, 111 (3d Cir.1981) ("employer liable for punitive damages for the conduct of his agent when the record shows that he was, 'by action or knowledgeable inaction, involved in the wrongdoing'" (citation omitted)). In this regard, Lightning Lube points to a memorandum that Corwin wrote to Witco's management suggesting that Witco confiscate Lightning Lube's equipment to ensure that its franchisees use Kendall oil. We, however, do not find this document probative of ratification or authorization, inasmuch as there is no evidence that anyone at Witco acted upon the memorandum. Lightning Lube does not dispute that Corwin committed no tortious acts after he sent this memorandum in August 1987. Therefore, even if the memorandum had put Witco on notice of Corwin's activities, there was no subsequent wrongdoing that Witco could have authorized or ratified. Moreover, the memorandum in and of itself did not put Witco on notice of any past wrongdoing on Corwin's part. Similarly, although Lightning Lube argues that Corwin testified that he kept executives "abreast of his actions," and therefore by implication of his misconduct, "each and every day," the weekly sales reports to which Corwin referred and that Lightning Lube cites, do not mention his allegedly tortious contacts.

Next, Lightning Lube notes that in February 1987 Venuto began discussions with Valvoline, with the intent that Valvoline would lend money to him to pay off Witco for the equipment loan, but that these discussions ended after Corwin wrote a memorandum to Glady, stating that he intended to talk to Valvoline to tell them that Witco owned Venuto's equipment. Lightning Lube would have us assume, based on this memorandum, that Corwin wrongfully persuaded Valvoline to terminate negotiations and that Witco's management ratified this conduct when it read his memorandum and did nothing to stop him. But, again, Lightning Lube adduced no proof showing that Corwin actually did the act he discussed in the memorandum. Likewise, no evidence links Valvoline's raising questions about the payback schedule

with any Witco activity approved or ratified by Witco's management.

Finally, Lightning Lube places great significance on the purported fact that no equipment could be offered, let alone provided, to Lightning Lube franchisees without the authorization of top Witco officials. From this premise Lightning Lube assumes that management must have known of Corwin's offers of free equipment to the franchisees. We disagree. The mere fact that management approved the installation of equipment at sites of former Lightning Lube franchisees does not establish that management knew or authorized that equipment was offered as an inducement to terminate a Lightning Lube franchise.

### 2. *Payback Schedule*

■ Lightning Lube argues that the denial of the payback schedule justifies a punitive award because it constituted a deliberate attempt by Witco's management to disrupt Lightning Lube's relations with its franchisees. However, the record does not support the conclusion that the Witco management deliberately deprived Lightning Lube of the schedule to destroy it. Documents obtained from Witco which showed that Glady repeatedly implored the credit department to send Venuto the schedule belie Lightning Lube's contention in this regard. The delayed delivery of the payback schedule thus amounted to only a breach of contract.

■ Under New Jersey law breaches of contract, even if intentionally committed, do not warrant an award of punitive damages in the absence of a showing that defendant also breached a duty independent of that created by the contract. *See, e.g., W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.,* 746 F.2d 215, 217 (3d Cir.1984) (" '[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable' " (quoting *Restatement (Second) of Contracts* § 355 (1979))); *Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445, 455 (1993) (permitting insured to recover punitive damages in context of insurer's breach of policy agreement where insurer also committed separate and intentional tort of refusing in bad faith to

pay claim); *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.,* 358 A.2d at 812 (punitive damages may be awarded only where breaching party shares fiduciary relationship with plaintiff). There may be such an independent breach if the defendant commits a tort or violates a special relationship of trust between the parties; in which case it is the commission of the tort or the breach of trust, "rather than the breach of the contract, which gives rise to an award of punitive damages." *W.A. Wright,* 746 F.2d at 217. As we explained above, the agreement between Witco and Lightning Lube did not create a fiduciary relationship between them. Therefore, without sufficient proof that Witco's withholding of the payment schedule was deliberate, let alone the product of an "evil minded" intent to harm Lightning Lube, Witco's failure to deliver it on time cannot support an award of punitive damages.

### 3. *Cover–Up*

Lightning Lube also argues that Witco's management "embarked on a corporate campaign of intentional deceit that independently" warranted an award of punitive damages. In this regard, Lightning Lube claims that Witco's witnesses lied at trial, thus signifying that Witco attempted to cover up its intentional deceit with regard to the payback schedule. The evidence, however, simply does not support this conclusion. Lightning Lube does not point to any fabricated evidence introduced by Witco. The mere fact that the jury disbelieved Witco's witnesses or that their testimony at times contradicted the documentary evidence does not show that Witco engaged in a scheme of deception.

### 4. *Witco–Avis Venture*

■ Lightning Lube next points to Witco's agreement with Avis to start the joint venture as proof of its evil-minded intent. Yet, there is no showing of a nexus between Witco's participation in the venture and the acts of Witco salespersons in tortiously interfering with Lightning Lube's agreements with its franchisees. Thus, these incidents cannot be linked so that an inference may be drawn from them that Witco's management intended to destroy Lightning Lube. In

reaching our conclusion we recognize that direct proof, such as that of an executive's signature, is often unavailable to demonstrate corporate complicity. But, although direct evidence or circumstantial evidence of the "smoking gun" variety is not required to award punitive damages, a plaintiff must show something more than the fact that the company would have benefitted economically from harm done to its rival and that there were acts of tortious interference by lower-level employees. Employees, after all, without encouragement of management may believe that hurting their competitor ultimately would benefit them. Thus, some link must be shown between the possible economic motive of management and the tortious acts to establish a malicious intent on the part of the company. Based on the evidence adduced at trial, we see no such link.

### 5. Credit Hold

■ Lightning Lube claims that the credit hold in December 1986 and equipment cutoff January 1987 were improper and demonstrate Witco's wrongful motives. However, Lightning Lube ignores the jury's determination that Lightning Lube owed money to Witco. Moreover, we find, based on the record, that Witco acted within its rights in imposing a credit hold on an account on which Lightning Lube was more than 90 days delinquent and in freezing its delivery of equipment. The evidence does not support Lightning Lube's argument that Witco's executives should not have approved the hold because "they had received previous information that Lube was current in its bills." Lightning Lube Br. at 14. According to the evidence, Witco's management received information that Lightning Lube's payments were current as of September 1986; but the credit hold was imposed in December 1986, when Lightning Lube was again in arrears. Similarly, no evidence supports Lightning Lube's charge that Witco improperly demanded full repayment of the 5–year equipment loan before it was due. Rather, the record indicates only that Witco would not sell Lightning Lube additional equipment under their agreement. Witco had the right to

insist that Lightning Lube pay for its equipment before Witco sold it new equipment, inasmuch as Witco had no obligation to sell Lightning Lube additional equipment.

### 6. Source of Oil Fraud

■ Lightning Lube argues that Witco's fraud in regard to the source of oil warrants an inference of corporate intent. Yet, as we explained above, despite the fact that the jury found that Lightning Lube had proven all of the elements of a claim of misrepresentation as to the source of oil, the jury also found that Lightning Lube sustained no damages on this claim. Furthermore, the jury did not award Lightning Lube nominal damages on this claim. Although an award of compensatory damages is not a prerequisite for a punitive award, see Nappe v. Anschelewitz, 477 A.2d at 1233, at least some injury, loss, or detriment to the plaintiff must occur to warrant punitive damages. Id. at 1229; see also O'Connor v. Harms, 111 N.J.Super. 22, 266 A.2d 605 (App.Div.), certif. denied, 57 N.J. 137, 270 A.2d 40 (1970) (striking down punitive damages award because no nominal damages were awarded). Inasmuch as the jury did not find sufficient injury to award nominal damages on this claim, the source of oil fraud cannot sustain an award of punitive damages.

Lightning Lube challenges this conclusion by arguing that the jury instructions did not include an explicit provision for an award of nominal damages. It argues that a rational jury, acting under the trial court's instructions, could have determined that, although the interrogatories contained no space in which nominal damages could be written, the jury nonetheless was authorized to proceed in imposing punitive damages as if nominal damages had been awarded on the source of oil claim. Lightning Lube therefore invites us to assume that the jury awarded nominal damages. We decline to accept this invitation. Given the court's instructions to the jury and the wording of the interrogatories, we are satisfied that the jury knew to award nominal damages expressly if it desired to do so.[22]

---

**22.** In an extraordinary argument Lightning Lube

attempts to bolster its contention that the inter-

### 7. Glady's Activities

Lightning Lube also argues that Glady's participation in the Wieland incident was not his only tortious act. After closely studying the record, we reject this assertion. Lightning Lube cites to a memorandum written by Glady in January 1987 ordering Witco salespersons to contact Lightning Lube franchisees directly with respect to the sale of oil products. In Lightning Lube's view, this order was tortious because it signified an attempt to circumvent Venuto. We conclude that inasmuch as this memorandum was connected with the credit hold, a jury could not find that Glady acted improperly. Nor, as we explained above, could the jury have believed reasonably that Witco instituted the credit hold for pretextual reasons to justify selling oil directly to the franchisees.

Similarly, we agree with the district court's conclusion that Glady's activities in connection with the Wieland incident cannot sustain an award of punitive damages. In this regard, Witco argues that Glady's conduct was free of culpable intent, and even if it was not, Glady was not an executive at the time. We do not address either Glady's status in the Witco hierarchy or the district court's reasoning, that a single tortious act by Glady could not give rise to an award of punitive damages for a wide-ranging corporate scheme, inasmuch as we agree with Witco's first argument. Based on the record, we see no evidence showing that Glady intentionally ratified Eyers's offer of free equipment to Wieland. On the contrary, a memorandum by Glady to his superiors indicates that he withdrew the offer and explained to Wieland that Witco had a special arrangement with Lightning Lube in regard to its equipment. Lightning Lube raises the possibility that Glady lied in the memorandum to give his superiors "cover," but the mere fact the jury could disbelieve the contents of the memorandum does not substitute for proof that Glady intentionally sought to interfere with Lightning Lube's relations with Wieland.

### 8. Counterclaim

Finally, Lightning Lube argues that Witco's filing of a counterclaim, which the district court partially dismissed on April 20, 1992, justifies a punitive award because it constituted an intentional corporate decision by Witco to injure Lightning Lube through the making of false allegations. The counterclaim to the extent dismissed and germane here accused Lightning Lube of defrauding its franchisees by overcharging them for oil it had purchased from Witco. Lightning Lube argues, however, that Witco filed the claim knowing it was not true and that it would have a devastating effect on Lightning Lube, because Lightning Lube would be required to disclose Witco's charges to existing and prospective franchisees. Venuto testified that the disclosure of this counterclaim "completely stopped all sales" of new franchises and was Lightning Lube's death blow. Lightning Lube Br. at 9. In order to show that Witco filed the counterclaim solely to destroy Lightning Lube's relations with its franchisees, Venuto and Kleger testified that Witco's attorneys threatened "to bury" Lightning Lube when it filed suit against Witco and, upon filing the counterclaim said, "you can't sell no [sic] franchises now, can you Ralph?" In granting Witco's posttrial motions, the district court ruled that it had erred in admitting evidence of these statements.

Witco advances two arguments as to why the counterclaim and the alleged statements by Witco counsel do not warrant a punitive award. First, Witco argues that the district court's denial of two Rule 11 motions against Witco and Witco's counsel, based on the counterclaim, bars the jury from inferring any malice in determining punitive damages. We summarily reject this contention. Inasmuch as the denial of a Rule 11 motion does not foreclose the assertion of a subsequent malicious prosecution suit, see *Cohen v. Lupo*, 927 F.2d 363, 365 (8th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 180, 116 L.Ed.2d 142 (1991) (grant of Rule 11

rogatory and answer should be construed as Lightning Lube suggests because Witco's counsel drafted the interrogatory and thus "invited" the possible error. We prefer the more conventional approach that *Lightning Lube cannot complain of the form of the interrogatory because it did not object to it.*

motion not res judicata with respect to state claim of malicious prosecution); *Amwest Mortgage Corp. v. Grady*, 925 F.2d 1162, 1165 (9th Cir.1991) (denial of Rule 11 motion will not support federal court's enjoining state malicious prosecution proceeding), neither should it automatically prevent an award of punitive damages predicated on conduct of which the moving party on the Rule 11 motion complained. Where, as here, the Rule 11 proceedings were limited in scope and did not constitute a full and fair litigation of the issues presented to the jury, it would be inappropriate to use such collateral proceedings to re-examine the jury's finding of malice. "[T]he court cannot consistent with the Seventh Amendment, evaluate a jury's verdict based on evidence that the jury was not permitted to consider at trial or on a legal standard not given to the jury." *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 108 (4th Cir.1991).

 Witco's second argument is that under New Jersey law evidence of an allegedly false judicial pleading is inadmissible to establish willfulness for purposes of tortious interference in a subsequent judicial proceeding. *See Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 117 A.2d 889 (1955) (allegations made in judicial proceeding cannot form predicate for action in defamation or tortious interference because such allegations are absolutely privileged). Thus, Witco maintains that the counterclaim is absolutely privileged and cannot be used as evidence of corporate malice. However, we agree with Lightning Lube that if such a privilege existed in the circumstances of this case, Witco has waived it. Although Witco objected to the introduction of evidence of the statements by its attorneys, it never objected to testimony regarding the counterclaim itself. Furthermore, Witco did not assert the claim of privilege as an affirmative defense in its answer or joint pretrial order.

 Even if admissible, however, we find that, viewed in the light most favorable to Lightning Lube, the evidence of Witco's counterclaim, when considered separately from the attorney's statements, cannot sustain an award of punitive damages. Lightning Lube's accusations in regard to the

counterclaim are analogous to the tort of wrongful use of civil proceedings, more commonly known as malicious prosecution. Under New Jersey law, a plaintiff asserting a claim of malicious prosecution must prove that the defendant (1) instituted proceedings (2) without probable cause and (3) with legal malice and (4) that the proceedings terminated in favor of the plaintiff. *See Westhoff v. Kerr Steamship Co*, 219 N.J.Super. 316, 530 A.2d 352 (App.Div.1987). Legal malice is defined as either knowingly acting without probable cause—*i.e.*, a reasonable belief—or primarily for a purpose other than securing the proper adjudication of the claim in which the proceedings are based. Thus, even if the allegations contained in Witco's counterclaim turned out to be false, so long as its assertion of the counterclaim was not malicious and without probable cause, there is no cause of action for malicious prosecution. Furthermore, the instigator of a civil suit may rely on facts which it reasonably might be expected that subsequent pretrial discovery would adduce. *Westhoff*, 530 A.2d at 355. This is because

> obviously less in the way of grounds for belief will be required to justify a reasonable man in bringing a civil rather than a criminal suit. Sometimes this is expressed by saying that want of probable cause must be 'very clearly proven' or 'very palpable,' or that 'greater latitude' must be allowed than in a criminal case. Apparently what is meant is merely that the instigator need not have the same degree of certainty as to the facts, or even the same belief in the soundness of his case, and that he is justified in bringing a civil suit when he reasonably believes that he has a good chance of establishing it to the satisfaction of the court or the jury.

*Id.* (quoting *Prosser and Keeton on the Law of Torts* § 120, at 843 (5th Ed.1984)). Applying this standard to the present case, and disregarding the statements of Witco's attorneys to Kleger and Venuto, the evidence in this case simply does not establish that, *at the time it asserted the counterclaim*, Witco acted without probable cause or with an improper purpose, let alone with the egregious

motive necessary to warrant a punitive award.[23]

▮ Having determined that the remaining evidence concerning the counterclaim does not provide an adequate basis for a claim of malicious prosecution[24] and thus cannot standing alone be the predicate for punitive damages here, we next address whether the district court improperly admitted the evidence of the attorneys' statements, and, if so, whether we still must consider this evidence in determining the sufficiency of the proofs with respect to Witco's state of mind in filing the counterclaim. In considering Witco's posttrial motions, the district court ruled that it erred in admitting the extra-judicial statements by Witco's lawyers against Witco as admissions under Fed. R.Evid. 801(d)(2)(C). We agree. Rule 801(d)(2)(C) specifically excludes from the definition of hearsay any statements used against a party which were made by another person authorized by the party to make a statement concerning the subject. Courts have applied this rule to admit evidence of statements made by attorneys in a representational capacity. *Hanson v. Waller,* 888 F.2d 806, 814 (11th Cir.1989).

▮ But not every out-of-court statement by an attorney constitutes an admission which may be used against his or her client. Rather, an attorney has authority to bind the client only with respect to statements directly related to the management of the litigation. *United States v. Dolleris,* 408 F.2d 918, 921 (6th Cir.1969) ("[a]n attorney, merely because of his employment in connection with litigation, does not have the authority to make out-of-court admissions for his client, except those which are directly related to the management of that litigation."), *cert. denied,* 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). Thus, courts "generally measure the authority of the attorney to make out-of-court admissions by the same tests of express or implied authority as would be applied to other agents." John W. Strong, 2 *McCormick on Evidence* § 259, at 163 (4th Ed.1992). Here, no evidence shows that the statements of Witco's attorneys were related to the management of the litigation or that Witco otherwise authorized its attorneys to make these statements. The district court, therefore, should not have admitted these statements.

During oral argument, Lightning Lube suggested that if we determined that the district court improperly admitted evidence in connection with the counterclaim, such a determination could lead at most to a remand for a new trial on punitive damages, but not the affirmance of the district court's grant of judgment on that claim. Lightning Lube makes this contention because in its view neither the district court nor the appellate court when considering a motion for judgment as a matter of law, may ignore evidence later found to have been admitted erroneously, but instead must consider all the evidence submitted to the jury.

This argument is directly contrary to *Lippay v. Christos,* 996 F.2d 1490, 1501 (3d Cir.1993). In that case, after holding that the district court erroneously had admitted hearsay evidence, we vacated the district court's order denying the defendant's motion for judgment as a matter of law and remanded the case to the district court to reconsider the motion without the inadmissible evidence.[25] Remarkably, just as in this case, the inadmissible evidence in *Lippay* was a statement by a purported agent of the defendant that was used improperly against the defendant as a vicarious admission to demonstrate malice. While Lightning Lube argues

---

**23.** Again as we explained in footnote 21 *supra,* we do not decide whether a showing of legal malice in regard to an intentional tort meets the same threshold requirement as actual malice for punitive damages.

**24.** We hasten to add that while we are drawing on the law of malicious prosecution in considering the counterclaim, we are well aware that we are not dealing with an actual malicious prosecution claim. Indeed, it is questionable as to

whether Lightning Lube could have presented such a claim in this case. *See Penwag Property Co. v. Landau,* 76 N.J. 595, 388 A.2d 1265 (1978).

**25.** Of course, even before our holding in *Lippay,* it was clear that in considering a posttrial motion for a new trial the court is free to consider the abridged record. *Aloe,* 816 F.2d at 115 (citing *Montgomery Ward & Co. v. Duncan,* 311 U.S. at 249, 61 S.Ct. at 194).

against the result in *Lippay*, which it dismissed at oral argument as being an almost inadvertent holding, *Lippay* is binding on this panel.

In fact, there was nothing startling in *Lippay* because dicta in *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 115–16 (3d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987), foreshadowed its holding. In *Aloe* we found unpersuasive cases from outside this circuit holding that a district court cannot grant judgment as a matter of law without consideration of evidence it wrongly had admitted. It is true that over 50 years ago, the Supreme Court suggested in dicta that assertions that the district court erred in admitting or excluding evidence should not be considered in a motion for judgment. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 249, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). But to our knowledge the Supreme Court never has addressed directly the issue of whether a trial court, in reviewing the sufficiency of the evidence with respect to a motion for judgment, must take the record as presented to the jury and thus cannot enter judgment on a record altered by the elimination of inadmissible evidence.[26]

See Aloe, 816 F.2d at 115 (stating that this issue is unresolved).

We also recognize that other courts of appeals that have ruled on the issue and have determined that the district court should not review a truncated record, *see, e.g., Jackson v. Pleasant Grove Health Care Ctr.*, 980 F.2d 692, 695 (11th Cir.1993); *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1343 (6th Cir.1992), have cited the nonmovant's reliance interest as their rationale. According to these courts, "if evidence is ruled inadmissible during the course of the trial, the plaintiff has the opportunity to introduce new evidence." *Jackson v. Pleasant Grove*, 980 F.2d at 696. But, "when that evidence is ruled inadmissible in the context of deciding a motion for [judgment as a matter of law], the plaintiff, having relied on the evidence already introduced is unable to remedy the situation." *Id.* Yet, as we pointed out in *Aloe*, "this explanation of course does not address either the competing reliance of the defendant, or the homespun axioms that a litigant is entitled to only one bite of the apple or to only three strikes at bat." 816 F.2d at 116. Further, we find no reason to suppose that a litigant would hold back significant evidence at trial.[27] Indeed,

---

**26.** There is a difference between determining whether evidence should be excluded on a motion for judgment as a matter of law and deciding whether a record contains sufficient evidence to sustain a verdict. For example, a litigant moving for judgment as a matter of law may argue as a reason for granting its motion that certain evidence was admitted erroneously because it was prejudicial. It is possible that even excluding such evidence, the jury had a sufficient reason to find against the movant, but the admission of the additional evidence so inflamed it as to affect its deliberations. This might be the case, for example, with bad character evidence introduced pursuant to Fed.R.Evid. 608. In such a case, it clearly would be inappropriate for the district court to rely on this evidentiary error in granting the motion for judgment because the issue of harmful error is distinct from the issue of the sufficiency of the evidence. A different situation is presented, however, where the movant predicates his motion for judgment on a claim that without the inadmissible evidence, there is insufficient evidence to sustain the verdict. We find the Court's dicta in *Montgomery Ward* is unclear as to whether, in determining a motion for judgment, excluding inadmissible evidence that falls into this latter category is inappropriate.

**27.** In arguing that we should consider the inadmissible evidence, Lightning Lube also points to *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988), where the Supreme Court held that the Double Jeopardy clause would not prevent the retrial of a defendant following the reversal of the initial conviction on the grounds that evidence erroneously was admitted, where the sum of the evidence, whether erroneously admitted or not, would have been sufficient to sustain a guilty verdict. Lightning Lube contends that if it is permissible for a court to consider erroneously admitted evidence in determining whether to retry a criminal defendant, despite the defendant's Double Jeopardy rights, then it should be permissible for the court to consider inadmissible evidence in a civil case when deciding a motion for judgment. But the Supreme Court's holding that the Fifth Amendment does not bar a retrial in such circumstances, does not mean that a court in a civil case should not adhere to circuit precedent precluding the court, based on nonconstitutional reasons, to consider inadmissible evidence on a motion for judgment. The questions of what the Fifth Amendment will allow and what a prudent circuit rule should be in a civil case are distinct. Furthermore, there are good reasons to distinguish between criminal and civil cases in this

**1200**

Lightning Lube has not pointed to any additional evidence of the culpability of Witco's management that it withheld at trial, but would have introduced had it known that the court ultimately would rule evidence of the attorneys' state of mind concerning the counterclaim to be inadmissible.

We recognize that the rule enunciated in *Lippay* could lead to an unjust result where a litigant actually tendered additional evidence which the district court excluded on the ground that it was cumulative. In that situation it would be unfair, in determining a posttrial motion for judgment, for a court to disregard the erroneously admitted evidence if the excluded evidence could have substituted for it. Thus, in such a case, which was not the situation in *Lippay*, fairness would dictate that the district court consider the entire trial record in ruling on a motion for judgment. But Witco has not suggested that the district court excluded, as cumulative, evidence of the same character as that of the counterclaim.

In light of our precedent in *Lippay*, we hold that we may not consider the inadmissible evidence of the lawyers' statements in reviewing the sufficiency of the evidence sustaining the punitive award. Given this determination, and the insufficiency of the remaining evidence of malice in connection with the counterclaim, we further conclude that the counterclaim cannot support an award of punitive damages.

In sum, viewed in the light most favorable to Lightning Lube, the admissible evidence presented cannot support a finding of "evil-minded" motives or a "willful disregard" of Lightning Lube's rights on the part of Witco's management. We recognize that, in certain circumstances, a jury properly may infer malice from the sum of the acts proved, even where no individual act could support such an award. *See, e.g., Viviano v. CBS, Inc.,*

597 A.2d at 552. In this case, however, no jury could infer that the wrongful acts, whether considered separately or cumulatively, were authorized or ratified by the corporation. The record is devoid of evidence showing the existence of a plot. Lightning Lube's attempt to create a wide-ranging corporate scheme out of isolated events rests on speculation only. We therefore will affirm the district court's grant of judgment as a matter of law on this claim.

## V. CONCLUSION

For all of the foregoing reasons, we will affirm the judgment orders of September 2, 1992, and February 19, 1991. The parties will bear their own costs on this appeal.

---

respect. First, notwithstanding a defendant's Double Jeopardy rights, in a criminal case it is appropriate to consider that there is a public interest in the prosecution not present in private civil litigation. Second, as a practical matter a prosecutor in a criminal proceeding may have reasons to withhold evidence that a party would not have in a civil case. Thus, a prosecutor might be reluctant to produce some evidence because of a concern that its revelation would

compromise other investigations or because potential witnesses may be intimidated. These concerns are not likely to be present in a civil case. We also note that if a motion for judgment is granted after the exclusion of evidence, in a civil case the losing party may have an opportunity under Fed.R.Civ.P. 60(b)(2) to seek relief from an adverse judgment and thereby obtain a new trial. The prosecutor following an acquittal has no such opportunity.